Filed 8/23/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| AMY LEE PHILLIPS, | 2d Civil No. B263353 |
| Plaintiff and Respondent, | (Super. Ct. No. 15FL-0054) |
| | (San Luis Obispo County) |
| v. | |
| | OPINION ON REHEARING |
| JAMES EUGENE CAMPBELL, JR., | |
| Defendant and Appellant. | |

Sitting as trier of fact, a trial court may draw its own inferences and conclusions from the evidence when hearing a matter brought pursuant to the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.)[1] This includes the power to factually find a "dating relationship" within the meaning of the DVPA even though the parties characterize their relationship as a friendship that does not involve "dating" as that term is commonly understood. (See e.g., *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 696-697 (*Fibreboard*).)

James Eugene Campbell, Jr., appearing in propria persona, appeals from a DVPA restraining order prohibiting him from harassing or contacting respondent and compelling him to stay at least 500 yards away from her person, residence, and workplace. In addition to claiming that the parties did not have a dating relationship, appellant contends that the trial court (1) erroneously denied his motion to dismiss the case, (2) erroneously granted the restraining order because his conduct was nonviolent,

_____

[1] Unless otherwise stated, all statutory references are to the Family Code.

and (3) violated his First Amendment rights of freedom of speech and expression.[2] We affirm.

*Factual and Procedural Background*

In March 2013 a Tennessee court issued a protective order requiring appellant to stay away from and have no contact with respondent. The order expired in March 2014.

In January 2015 in the County of San Luis Obispo, respondent applied for a domestic violence restraining order against appellant. Respondent, a professional cyclist, declared that she had "met [appellant] 2 1/2 years ago through cycling." She had been friends with him for several months. Appellant "expressed an interest in moving forward in [the] relationship," but respondent "informed [him] that [she] was not interested in moving forward . . . , and [she] wanted to just be friends." "One night, at 3:30 am, [appellant] came to [respondent's] house, banging on the door and windows." Thereafter, appellant repeatedly harassed respondent by sending text messages to her, posting her personal information and photos of her on Facebook, posting videos of her on YouTube, and sending "private messages to individuals sharing personal information about [her]." In text messages to respondent, appellant called her a "psycho evil witch" and "a compulsive liar" who had "lied" about him and "destroyed [his] life."

The matter was set for a hearing on February 19, 2015. On that date, respondent's counsel appeared in court. Respondent was "on a bicycle Tour in New Zealand." Appellant, who lived in Florida, appeared in propria persona via the telephone.

At the beginning of the hearing, appellant told the court: "[M]y understanding is the [respondent] has chosen to be out of the country, knowing that the court date was today. I would ask that the court dismiss the case." The court did not rule

---

[2] Appellant also argues that respondent "lied on her [Form] DV-100 [entitled "Request for Domestic Violence Restraining Order"] and stated she resided in California . . . ." Appellant asserts that respondent actually resided in Chattanooga, Tennessee. The argument is forfeited because it is unsupported by citations to the record and meaningful analysis. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-408.)

on the motion. It put the matter over until 3:15 p.m. At that time, the court said, "This case . . . is going to take a lot longer." The court continued the hearing to February 26, 2015. Appellant did not object.

On February 26, 2015, appellant again appeared in propria persona via the telephone. Respondent was personally present with her counsel. After extensive argument, the trial court found that "there was a relationship [between the parties] that qualifies as a dating relationship and that the communications and interaction from [appellant] to [respondent] qualifies for a domestic violence restraining order protecting [respondent]."

*Motion to Dismiss*

Appellant contends that, at the hearing on February 19, 2015, the trial court erroneously denied his motion to dismiss. But the court did not deny the motion. It never ruled on the motion, and appellant did not press for a ruling. He did not object to the continuance of the hearing to February 26, 2015. "[H]is failure to press for a ruling [and to object to a continuance] waives the issue on appeal. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 984; see also *In re Richard H.* (1991) 234 Cal.App.3d 1351, 1362 ["Since appellant did not object to any of the continuances, he has waived his right to claim any harm from the delay"].)

Had the trial court denied the motion to dismiss, we would have upheld its ruling. Appellant's motion was based on respondent's failure to be personally present at the hearing, even though her counsel was present. Appellant relies on former section 243, subdivision (a). It provided: "When the matter first comes up for hearing, the petitioner must be ready to proceed."[3] Appellant has failed to show that respondent's counsel was not ready to proceed. The statute does not provide that the petitioner must be personally present.

---

[3] The quoted language was eliminated by a 2015 amendment that became effective on January 1, 2016. (Stats. 2015, ch. 411, § 5.)

*Dating Relationship*

Respondent sought a restraining order pursuant to the DVPA. Such an order may be granted where the parties are "having or [have] had a dating . . . relationship." (§§ 6211, subd. (c), 6301, subd. (a).)

The DVPA originally did not define "dating relationship." In *Oriola v. Thaler* (2000) 84 Cal.App.4th 397, 412, the court concluded that "a 'dating relationship' refers to serious courtship. It is a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." Based on this definition, the *Oriola* court determined that the plaintiff was not entitled to a DVPA restraining order because a dating relationship between the parties had not existed.

The legislature responded swiftly to *Oriola's* definition of "dating relationship." In 2001 it passed Assembly Bill 362, enacting section 6210 which gave the phrase "dating relationship" a technical definition for purposes of the DVPA: "'Dating relationship' means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." [4] (Stats. 2001, ch. 110, § 1.) The Senate Judiciary Committee analysis of Assembly Bill 362 noted: "[T]he Oriola decision 'resulted in the fact that anyone who was involved in a dating relationship short of 'serious courtship' is excluded from the protections of California's excellent Domestic Violence Prevention Act.' [¶] If enacted, this bill would nullify the definition crafted by the court in Oriola . . . ." (Sen. Judiciary Com., Analysis of Assem. Bill No. 362 (2001-2002 Reg. Sess.), July 3, 2001, pp. 5-6.) In determining legislative intent, we may consider bill analyses prepared by the staff of legislative committees. (*People v. Benson* (1998) 18 Cal.4th 24, 34, fn. 6.)

---

[4] The same definition of "dating relationship" appears in Penal Code section 243, subdivision (f)(10). Section 243, subdivision (e)(1) applies to a battery committed against "a person with whom the defendant currently has, or has previously had, a dating . . . relationship."

Appellant claims that the trial court erroneously found that the parties had a dating relationship.  He characterizes their former relationship as "BEST FRIENDS."  Appellant says that ". . . [a]ny reference to Appellant's 'love' for [respondent] is . . . a platonic love of caring and concern for his BEST FRIEND."  "[T]he parties engaged in social activities just like [appellant] does with all of his friends."

We review for substantial evidence the trial court's finding that a dating relationship existed.  (*J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 975.)  "The ultimate determination is whether a *reasonable* trier of fact could have found [the existence of a dating relationship] based on the *whole* record.  [Citation.]"  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)  "We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order.  [Citation.]"  (*Horsford v. Board of Trustees of California State Univ.* (2005) 132 Cal.App.4th 359, 390.)  "[T]he substantial evidence standard of review is generally considered the most difficult standard of review to meet. . . .  In deciding whether to raise a substantial evidence claim on appeal, appellate counsel should keep in mind that the appellate court 'accept[s] the evidence most favorable to the order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.'  [Citation.]"  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 595.)

Substantial evidence supports the trial court's express finding that a dating relationship existed because a reasonable trier of fact could find that the parties had "frequent, intimate associations primarily characterized by the expectation of affection . . . ."  (§ 6210.)  Respondent declared:  "We were friends for several months.  During that time, we spent time together, dined out on occasion, and [appellant] stayed in my home for several days . . . ."  Respondent sent a message to appellant stating that he had a strong emotional "hold" on her.  She complimented him on a kiss that he had given her.  In an email to appellant dated November 22, 2012, respondent said:  "[T]hat hug in the doorway and your hand on my lower back felt good."  "[T]he moments we were close (either wrestling on the couch, or when you were laying in bed with me), seemed more

5

platonic, versus romantic." Respondent referred to "[t]he time we've both invested to build our relationship over the past 7 months, . . . strengthening our love and respect for each other."

In his communications with respondent after she had rebuffed his advances, appellant made clear that he considered their relationship to have been more than a mere friendship. He accused her of "leading [him] on" while she was dating someone else. Appellant wrote: "What do u call telling me u love me but ur . . . [with] someone else?" "You can combine all those [other] guys . . . , and [they] still did not do for you what I did." "Didn't you tell me you wld always remember me and what a huge impact I had on your heart and life?" "At least I wont hv to deal with u ever again. How does tht make u feel that [the] only guy [i.e., appellant] u fell in love with ever would rather be dead than hear or see from u again?" "Ppl [people are] probably confused after u lying so much about me but then seeing how much love you had for me."

Appellant's statements to the trial court also showed that his relationship with respondent was more than just a friendship. At the hearing on February 26, 2015, appellant told the court that he thought "[respondent] was falling in love with me." Appellant acknowledged that he had said to her, "'You really couldn't understand why someone [i.e., appellant] loved you for just you without sex.'" Although there is no evidence that the parties had sexual relations, appellant admitted that in December 2012 he had sent nude photographs of himself to respondent. The nude photographs are evidence of "intimate associations" and an "expectation of . . . sexual involvement" within the meaning of section 6210. Appellant, however, stated to the court that "[t]here was nothing inappropriate about" the photographs, which had been taken when he "was nude modeling."

Respondent denied that her relationship with appellant involved "dating" as that term is commonly understood. In her application for a restraining order, she noted that the parties had "discussed [the] possibility of dating." In her November 22, 2012 email to appellant, respondent said that they were "just remaining friends" and "weren't dating, whether casually, socially, or non-committed dating."

6

The trial court was not required to accept, and did not accept, respondent's characterization of the parties' relationship. Respondent never conceded that the parties did not have a "dating relationship" within the meaning of section 6210. Whether a dating relationship existed was a factual question to be decided by the trial court based upon all of the evidence. The trial court stated: "[A]lthough in one portion [of the email respondent] says . . . something about, 'We don't have a dating relationship,' you do have a relationship by this evidence. All of the evidence shows there was an expectation of affection or desire to have affection . . . . So although you guys may have called it 'We are not dating' or 'We don't want to date,' you certainly have all the attributes, it looks like, [of a dating relationship] under [section] 6210 of the Family Code." When appellant protested that he had never actually gone on a date with respondent, the court replied: "What I have seen in these papers is that you guys had lots of communication, that you actually stayed at her residence . . . . So that's where I'm seeing there was something more to this than to say, 'We never went on a date.'"

The trial court drew reasonable inferences from the evidence in concluding that there was a dating relationship. "[A] finding based upon a reasonable inference . . . will not be set aside by an appellate court unless it appears that the inference was wholly irreconcilable with the evidence. [Citations.]" (*Fibreboard*, *supra*, 227 Cal.App.2d at p. 697.) "[W]hen the evidence gives rise to conflicting reasonable inferences, one of which supports the finding of the trial court, the trial court's finding is conclusive on appeal. [Citation.]" (*Rubin v. Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298.) Appellant has not demonstrated, as a matter of law, that the trial court erred in exercising its traditional power to draw reasonable inferences from the evidence.

*Claim of Nonviolent Conduct*

In his opening brief appellant states: "A record involving an indication of 'Domestic Violence' is a serious charge and has irreparable repercussions to a person's reputation. It is alarming that the [trial] court would rule against a male Appellant in this way when there was never any 'domestic' and never an occurrence of any 'violence' by

7

Appellant. Domestic violence by definition is violent or aggressive behavior within the home, typically involving the violent abuse of a spouse or partner. . . . [¶] The DVPA was created to protect people . . . who have legitimate fears of physical harm from a domestic partner."

At oral argument before this court, appellant complained that he is subject to a domestic violence restraining order even though his conduct was nonviolent. Appellant stated, "I can't get a job with a domestic violence restraining order on my record. If they do a background check, it shows up and everybody thinks I'm a violent monster . . . . This isn't domestic violence. It should be a harassment civil suit . . . ."

Except for an incident in Wisconsin, the record contains no evidence of appellant's use or threatened use of physical force against respondent. The incident occurred in June 2013, when appellant was subject to the Tennessee protective order. Respondent declared that appellant had "approached [her], grabbed [her] arm, and turned [her] around to talk to him." Respondent claimed that she has "a documented police report for this incident in Wisconsin."

Whether or not respondent is reasonably fearful that appellant will physically harm her, there is no DVPA requirement of a physical threat. Thus, there is no basis for appellant's claim at oral argument, "This isn't domestic violence." Nor is there any basis for the claim in his opening brief, "The DVPA was created to protect people . . . who have legitimate fears of physical harm from a domestic partner." "Violence," as that word is commonly defined, is not a prerequisite for obtaining a restraining order under the DVPA. The dictionary definition of "violence" is "the exertion of any physical force so as to injure or abuse." (Webster's 3d New Internat. Dict. (1981) p. 2554.) The DVPA, however, defines "domestic violence" as "abuse." (§ 6211.) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) For purposes of the DVPA, "abuse" means, inter alia, "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(4).) Section 6320, subdivision (a) permits the court to enjoin a party from "harassing . . . or disturbing the peace of the other party . . . ."

"'[T]he plain meaning of the phrase "disturbing the peace of the other party" in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party. . . . Therefore, the plain meaning of the phrase "disturbing the peace" in section 6320 may include, as abuse within the meaning of the DVPA, a former husband's alleged conduct in destroying the mental or emotional calm of his former wife . . . .' [Citation.]" (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146.) "There was substantial evidence presented at trial to support the trial court's finding that [appellant] disturbed the peace of [respondent], an act of 'abuse' under the DVPA." (*Id.*, at p. 1147.)

*First Amendment*

The trial court ordered appellant to "not post photographs, videos, or information about [respondent] to any internet site" and to "remove the same from any internet site over which he has access or control." Appellant argues that the order violated his "First Amendment rights of freedom of speech and expression." He explains: "Appellant's pictures and postings are innocuous toward [respondent] . . . . None of appellant's postings or photos are derogatory, threatening, . . . or violate any other item covered under the First Amendment."

Appellant "did not raise [this] constitutional issue[] below and do[es] not explain why [it is] being raised for the first time on appeal. [¶] Points not raised in the trial court will not be considered on appeal. [Citation.] 'Even a constitutional right must be raised at the trial level to preserve the issue on appeal [citation].' [Citation.] In civil cases, constitutional questions not raised in the trial court are considered waived. [Citation.]" (*Hepner v. Franchise Tax Board* (1997) 52 Cal.App.4th 1475, 1486.)

Moreover, appellant forfeited the issue because he has failed to present meaningful legal and factual analysis, with supporting citations to pertinent authority and the record, on why his first amendment rights were violated. "Under well-established principles of appellate review, '[t]o demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] . . .' [Appellant's] conclusory assertion[] [that his

9

First Amendment rights were violated] fail[s] to properly tender the issue for appellate review."  (*Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 587-588.)

If the issue were properly before us, we would "reject [appellant's First Amendment] argument because [his] ability to continue to engage in activity that has been determined after a hearing to constitute abuse [under the DVPA] is not the type of 'speech' afforded constitutional protection."  (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1429.)

*Disposition*

The judgment (DVPA restraining order) is affirmed.  Respondent is awarded costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

                                                                    YEGAN, J.

We concur:


    GILBERT, P. J.


    PERREN, J.

10

Gayle Peron, Commissioner

Superior Court County of San Luis Obispo

_____

James Eugene Campbell, Jr., Propria Persona, for Defendant and Appellant.

Lvovich & Szucsko, Terry A. Szucsko, Hannah R. Salassi, for Plaintiff and Respondent.