Filed 5/12/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>BENJAMIN SADIKI PROWELL,<br><br>       Defendant and Appellant. | C086156<br><br>(Super. Ct. No. CRF170417) |

APPEAL from a judgment of the Superior Court of Yolo County, Paul K. Richardson, Judge. Affirmed as modified.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

1

Following defendant Benjamin Sadiki Prowell's misdemeanor conviction for making harassing electronic communications (Pen. Code, § 653m, subd. (b)),[1] the trial court placed him on three years' probation with conditions prohibiting him from using or accessing social media Web sites and allowing warrantless searches of his communication devices. On appeal, defendant contends these probation conditions are overbroad.

The trial court imposed a variety of other probation conditions under section 1203.097, conditions mandated for crimes of domestic violence. As to these conditions, defendant contends there is no substantial evidence that he and the victim were in a dating relationship necessary to support the domestic violence conditions.

In the published portion of this opinion, we shall strike the communication device search condition and remand the case to the trial court to consider whether it can be narrowed in a manner that will allow it to pass constitutional muster. We otherwise affirm the judgment.

BACKGROUND

Defendant and the victim, Allison V., worked at the same location. They became friends, and a few months after defendant and Allison started working together, they began dating. Approximately six months later, in February 2016, Allison ended things with defendant because they both knew there was no future in the relationship. The initial breakup with defendant went fine, but shortly thereafter, he became agitated and "said no thank you to the breakup."

Defendant began calling Allison, sending her text messages, and messages through Facebook Messenger almost daily. He was angry and upset. For about a month, Allison attempted without success to defuse the conflict with politeness. Near the end of March

---

[1]     Undesignated statutory references are to the Penal Code.

of 2016, she stopped responding to defendant's e-mails and answering his calls. Defendant sent "e-mail after e-mail," close to 100 in all, and sent Allison Facebook messages in the middle of the night. He e-mailed her at her work and home e-mail addresses. Through texts, e-mails, and Facebook Messenger, Allison told defendant that his behavior was inappropriate, asked him to stop, and told him he was harassing her. In the spring of 2016, she blocked him from some social media, and blocked his number on her cell phone. He then contacted her on Instagram and she blocked him from that account as well. In some of the e-mails, defendant discussed Allison's children and her sister. He told her he was upset because Facebook was suggesting her family members as friends for him. He told her his Navy friends were coming to town, they knew what she looked like, and he did not want them to get in trouble or cause trouble, "because the Navy frowns upon cheaters." Defendant told Allison he had access to all of her account and computer information. In July 2016, she sent him an e-mail telling him to leave her and her family alone, that his behavior was unacceptable, he was harassing her, and that she was afraid.

Unrelated to these events, defendant's employment was terminated in April 2016, and his employer removed his key code access to the building. After defendant was fired, he knocked on the back door of the building, gave a male employee a box, and asked him to leave it in Allison's office. The box contained some belongings Allison had left at defendant's house, including a curling iron. It also contained things that were not hers, such as a journal notebook in defendant's handwriting in which he discusses their relationship and his anger about the relationship being over. The journal also contained poems and drawings. At home, Allison took security measures including getting a dog, hanging blackout curtains on her windows, and changing her alarm code. The e-mails from defendant also indicated he was using the Internet to obtain current information on her and her new boyfriend, including pictures. He told her he knew her secrets, commented about a photograph on Facebook of her and her son, and cautioned Allison to

3

be more careful about the information she posted on social media about her new boyfriend. He also communicated with the new boyfriend, and a friend of Allison's, through Facebook Messenger, text messages, and e-mails. In the communication with Allison's new boyfriend, defendant suggested that Allison was promiscuous and detailed what he said were her sexual preferences.

In October 2016, Allison contacted law enforcement. Detective Joshua Helton of the Davis Police Department called defendant, identified himself as law enforcement, and discussed defendant's contacts with Allison. Helton told defendant that Allison was feeling threatened by the contact and, in his opinion, defendant's conduct was criminal. Even after this conversation with Helton, defendant continued to contact Allison via e-mail and social media. He sent her a message asking her not to call law enforcement again and claimed he would not contact her again. In the next two months, defendant sent Allison 25 more e-mails. In the e-mails, defendant indicated that law enforcement had contacted him about his communications with her. Defendant also sent an Instagram message to Allison's new boyfriend, under the account name "TheStalker0000." Defendant also sent Helton a number of e-mails.

Detective Helton spoke to defendant again in January 2017. Helton told defendant he was going to forward the case to the district attorney, and if defendant continued to contact Allison, he might have to take additional action. Over the following weeks, defendant sent Allison numerous additional e-mails. Helton sought a warrant and arrested defendant.

After defendant's arrest, law enforcement officers examined his phone and found text messages with his former boss. In these exchanges, defendant admitted he had been sending Allison e-mails for months and that she called it harassment. At that point, defendant indicated he had to be more careful. He discussed attempting to break up the relationship between Allison and her friend, damaging Allison's professional reputation,

4

and disrupting her family member's business. He also admitted sending Allison's new boyfriend a message and using Facebook to find that boyfriend's information.

A jury found defendant not guilty of stalking but guilty of the lesser included offense of annoying or harassing communication (§ 653m, subd. (b)). After the verdict, defendant posted a picture on social media of Hannibal Lector eating flesh and said, "I hope she chokes on whatever pound of flesh she may have received from having pursued this matter."

Before sentencing, defense counsel raised the issue of whether the relationship qualified as a "dating relationship" and whether defendant's actions constituted "domestic violence" necessary for the imposition of section 1203.097 probation conditions. The trial court found there was clear evidence of a dating history, not just a casual relationship. The trial court also found the repeated contact, including after the police told him to stop, would instill fear, and thus constituted domestic violence.

The trial court placed defendant on three years' formal probation. Over defendant's overbreadth objection, the trial court imposed the following condition in handwriting on the probation order: "Defendant shall not use any social media sites or apps[,] including but not limited to Twitter, Facebook, Instagram and[,] in addition, [defendant] shall consent to the search of any communication devices in his possession [and] control and disclose passwords to any such devices and provide those to probation officers or police officers upon demand without warrant or suspicion." The trial court also imposed a number of probation conditions related to domestic violence, including entry and completion of a batterer's intervention program, a $500 fine under section 1203.097, subdivision (a)(5), and a 10-year no-contact order.

DISCUSSION

I

*Probation Conditions*

Defendant contends that the prohibition on accessing social media Web sites and applications, and the communication device search condition, are overbroad.

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.  [Citation.]"  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)  "Certain intrusions by government which would be invalid under traditional constitutional concepts may be reasonable at least to the extent that such intrusions are required by legitimate governmental demands."  (*In re White* (1979) 97 Cal.App.3d 141, 149-150.)  "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights . . . ."  (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)  "A [probation condition] is unconstitutionally overbroad . . . if it (1) 'impinge[s] on constitutional rights,' and (2) is not 'tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation.' [Citations.]"  (*Ibid.*)  We independently review defendant's constitutional challenge to a probation condition.  (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

*Social Media Sites*

Defendant argues the social media condition goes further than necessary to accomplish the state's goal of ensuring he does not use social media to harass or annoy Allison, especially given the no-contact order, relying primarily on cases dealing with probation conditions that prohibit all access to the Internet.  The condition at issue here is not nearly so broad; accordingly, those cases are of limited applicability.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once

more." (*Packingham v. North Carolina* (2017) 582 U.S. ___, ___ [198 L.Ed.2d 273, 279] (*Packingham*).) An important forum for such communication today is found on social media, and "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." (*Id.* at p. ___ [198 L.Ed.2d at p. 281].) In light of social media's role in protected communication, the United States Supreme Court struck down a state law making it a felony for registered sex offenders who had already completed their sentences " 'to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages.' " (*Id.* at pp. ___ [198 L.Ed.2d at pp. 278, 282-283].)

In *In re L.O.* (2018) 27 Cal.App.5th 706, Division Four of the Court of Appeal, First Appellate District, relied on *Packingham* to invalidate as facially unconstitutional a probation condition imposed on a minor convicted of battery which provided that " '[t]he Minor shall not access or participate in any Social Networking Site, including but not limited to Facebook.com.' " (*L.O.*, at pp. 708, 711, 713.) The court modified the condition to provide that "[a]s long as Minor's probation officer has the authority to allow social media use that is consistent with the state's compelling interest in reformation and rehabilitation, that probation condition is not facially overbroad." (*Id.* at p. 713.)

We disagree that *Packingham*, which involved the blanket criminalization of First Amendment activity on the part of those previously convicted of certain crimes, and who have already completed their sentences, compels the conclusion that all prohibitions on probationer access to social media are per se overbroad. Accordingly, we depart from the conclusion in *In re L.O.* that a probation restriction on accessing social media sites is unconstitutional in every potential application. The issue in *Packingham* was the constitutionality of a statute prohibiting registered sex offenders from accessing or creating or maintaining personal pages on social networking sites that permit minors to

become members. The statute also applied to those who had completed their sentences and were no longer in custody or under any judicial supervision. (*Packingham, supra*, 582 U.S. at p. ___ [198 L.Ed.2d at p. 278].) The Supreme Court held the statute burdened substantially more speech than necessary to further the government's interests in protecting minors from sexual abuse. (*Id.* at pp. ___ [198 L.Ed.2d at pp. 282-283].) That is quite a different circumstance from a probationer, whose rights are more limited. We conclude, as have many federal courts, that the reasoning of *Packingham* cannot and should not be used to assess whether there may be a circumstance in which a probationer may be prohibited from utilizing social networking sites in a manner consistent with constitutional principles during the period of probation. (*United States v. Carson* (8th Cir. 2019) 924 F.3d 467, 473; see *United States v. Halverson* (5th Cir. 2018) 897 F.3d 645, 657-658; *United States v. Browder* (2d Cir. 2017) 866 F.3d 504, 511, fn. 26; *United States v. Rock* (D.C. Cir. 2017) 863 F.3d 827, 831.)

A complete prohibition on a probationer's access to social networking Web sites during the term of probation might in some circumstances be a close fit between the legitimate purpose of the restriction—i.e., the reformation and rehabilitation of that probationer—and the burden that such a condition would impose on that probationer for the duration of the probationary term. This is such a case.

Defendant committed his crime, harassing Allison, via e-mail, text message, and Facebook. After she told him to stop contacting her, and blocked him on some social media platforms, he continued to e-mail her and contacted her through another social media site. He utilized social media sites to track her activities with her son and new boyfriend. He expanded his harassment of Allison to include contacting her friend and new boyfriend through social media applications. He created an alternate social media user name to contact her new boyfriend. Even after conviction, he posted a meme about Allison and this case on social media. Under these circumstances, where defendant used social media to perpetrate the crime for which he is on probation, gathered information

8

on the victim and her family through social media, had inappropriate contacts with the victim's friends through social media, and continued to use social media to discuss this case even after conviction, it is appropriate and constitutionally sound to impose such a complete prohibition.  As applied to a defendant who has utilized social networking sites in such a manner, imposition of a complete prohibition with respect to social networking sites is sufficiently tailored to the state's legitimate interest in reformation and rehabilitation of that probationer.

*Communication Devices*

As to the communication device search condition, defendant argues it is overbroad because there is no limit on the type of information to be searched or the permissible timeframe of any such search.

The United States Supreme Court's observations in *Riley v. California* (2014) 573 U.S. 373, 396-397 [189 L.Ed.2d 430, 448] make clear that a probation condition that authorizes the warrantless search of an electronic storage device, such as a cell phone, carries the potential for a significant intrusion into defendant's private affairs.  The electronic search condition at issue here "arguably sweeps more broadly than the standard three-way search condition allowing for searches of probationers' persons, vehicles, and homes.  First, by allowing warrantless searches of all of defendant's computers and electronic devices, the condition allows for searches of items outside his home or vehicle, or devices not in his custody—e.g., computers or devices he may leave at work or with a friend or relative.  Second, the scope of a digital search is extremely wide . . . .  Thus, a search of defendant's mobile electronic devices could potentially expose a large volume of documents or data, much of which may have nothing to do with illegal activity.  These could include, for example, medical records, financial records, personal diaries, and intimate correspondence with family and friends." (*People v. Appleton* (2016) 245 Cal.App.4th 717, 725.)  The mobile application software could also include

9

information about defendant's political and religious affiliations, health concerns, medical and financial data, hobbies, and social life. (*Riley*, at p. 396.)

The condition at issue here specifies "communication devices," rather than "electronic storage devices." A probation condition should be given " 'the meaning that would appear to a reasonable, objective reader.' " (*People v. Olguin* (2008) 45 Cal.4th 375, 382.) We interpret a probation condition in context and using "common sense." (*In re Ramon M*. (2009) 178 Cal.App.4th 665, 677, disapproved on other grounds in *In re G.C.* (2020) 8 Cal.5th 1119, 1133.) Given the trial court's specification of the devices subject to search as communication devices, rather than electronic storage devices, and the particular facts of this case, it appears to us that the trial court likely intended for the search condition to allow warrantless searches only of communication applications on those devices.[2] Thus, we agree with defendant that the electronic search condition impinges on his constitutional rights under the Fourth Amendment. (See *People v. Appleton, supra*, 245 Cal.App.4th at p. 724.) As currently stated, the communication device search condition "could potentially expose a large volume of documents or data, much of which may have nothing to do with illegal activity. These could include, for example, medical records, financial records, personal diaries, and intimate correspondence with family and friends." (*Id.* at p. 725.) The state's interests in preventing communication with and harassment of the victim, and fostering defendant's rehabilitation, could be served through narrower means. We therefore conclude that the communication device search condition is not sufficiently tailored to its purpose and must be modified to limit authorization of searches to devices, accounts, and applications that are reasonably likely to reveal whether defendant has engaged in prohibited

---

[2] We observe that many communication devices, including cell phones, computers, and tablets, also function as electronic storage devices.

10

communication with the victim or the use of social media, or otherwise violated the terms of his probation.

## II

### *Substantial Evidence of a Dating Relationship*

Defendant contends there is not substantial evidence to support the trial court's finding that he and Allison had a "dating relationship." Accordingly, he concludes the trial court erred in imposing the probation conditions mandated by section 1203.097 for people convicted of crimes of domestic violence.

Section 1203.097 requires that if the defendant "is granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code," the probation must include a number of specific terms, including a minimum probationary period, a criminal protective order, specific fines and fees, and successful completion of a batterer's program. As relevant to this case, one category of people defined in section 6211 of the Family Code is a "person with whom the respondent is having or has had a dating or engagement relationship." (Fam. Code, § 6211, subd. (c).)

We review the trial court's finding that Allison and defendant had a dating relationship for substantial evidence. That is, whether, based on the whole record, a reasonable trier of fact could have found a dating relationship. As always in a substantial evidence review, we resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 849-850.)

The term "dating relationship" is used both to proscribe and punish abuse in intimate partnerships through the Penal Code and to provide protection by way of a restraining order to victims under the Domestic Violence Protection Act. " ' "Dating relationship" means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations.' (Fam. Code, § 6210.)" (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1116.) This

11

definition "does not require 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time." (*Ibid.*) Conversely, the definition does not include a " 'casual relationship or an ordinary fraternization between [two] individuals in a business or social context.' " (*Id.* at p. 1117.)

Here, Allison indicated she and defendant started out as friends, then the relationship changed and they began dating. They dated for approximately six months. Defendant spent time at her home. Friends of each of them knew they were involved with each other. She ended the dating part of their relationship, realizing there was not a future in the relationship. Defendant told her he was "hers" until she said otherwise. After the relationship ended, he returned her belongings that had been at his home and gave her a journal notebook in his own handwriting that talked about their relationship. Defendant also indicated he believed Allison had been unfaithful to him. Defendant's roommate at the time described the relationship between Allison and defendant as a loving dating relationship. Her friends and his defined the termination of the relationship as a "break up." The termination of a casual relationship or "ordinary fraternization" is not generally considered as "break up." The trial court drew reasonable inferences from the evidence in concluding that there was a dating relationship. Substantial evidence supports the trial court's finding that Allison and defendant had a dating relationship. (*Phillips v. Campbell, supra*, 2 Cal.App.5th at pp. 850-851.)

DISPOSITION

The judgment is modified to strike the communication device search condition. The trial court is directed to issue an amended probation order striking the communications device search condition. As modified, the judgment is affirmed. Because the trial court may be able to impose a valid electronic search condition more

12

narrowly tailored to the state's interests, the case is remanded to the trial court for further proceedings consistent with this opinion.

                                    _____KRAUSE_____, J.

We concur:

_____MURRAY_____, Acting P. J.

_____DUARTE_____, J.

13