Filed 7/24/25 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| X.K.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>M.C.,<br><br>        Defendant and Respondent. | A170020<br><br>(Sonoma County<br>Super. Ct. No.<br>SFL094325)<br>ORDER MODIFYING<br>OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 25, 2025, and certified for publication on July 23, 2025, be modified as follows:

1. On page 2, in the second sentence of the fourth paragraph that begins, "In November 2016 . . . ." the name "Michael" is changed to "M.C."

There is no change in the judgment.


Dated: _____

                              BROWN, P.J.

Filed 6/25/25; Certified for Publication 7/23/25 (order attached) (unmodified version)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| X.K.,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>M.C.,<br><br>  Defendant and Respondent. | A170020<br><br>(Sonoma County<br>Super. Ct. No.<br>SFL094325) |

X.K. appeals the denial of her request for a domestic violence restraining order (DVRO) against M.C., her former husband and the father of her daughter, under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.[1]).  She contends that the trial court misunderstood the definition of "abuse" under the DVPA, denied her request for an improper reason, and failed to consider evidence of abuse and the totality of the circumstances, as required under the DVPA.  She also argues that the trial court violated her right to due process by failing to provide her with adequate assistance as a self-represented DVRO litigant.  For the reasons explained in this opinion, we will reverse the court's order and remand for a new hearing on whether a DVRO is appropriate.

BACKGROUND

---

[1] All further statutory references are to the Family Code unless otherwise stated.

X.K., a Chinese emigrant, and M.C., a United States citizen, married, and they had a child, J.K.C., in November 2017 in California. In May 2018, after X.K. completed her Ph.D. studies in California, the parties moved to China. M.C. moved out of the parties' apartment in China in 2020 and returned to California in January 2022.

X.K. and J.K.C. relocated to California in December 2022 because the parties believed J.K.C. would receive a better education in the United States. Upon returning to California, X.K. and J.K.C. resided with M.C. in his parents' home.

On August 20, 2023, X.K. left her in-laws' home with her daughter, seeking refuge at a confidential domestic violence shelter, and M.C. filed the petition for dissolution that initiated this action four days later.

On August 29, 2023, X.K. filed a DVRO request seeking temporary and permanent protection for herself and J.K.C. She alleged that she and J.K.C. were in immediate need of protection from M.C. because of a history of physical, sexual, and emotional abuse, beginning in 2016. Along with her DVRO request, X.K. sought sole physical and legal custody of J.K.C. and no visitation for M.C.

X.K. submitted a declaration in support of her request with the following facts. In November 2016, Michael expressed remorse for some of his conduct towards X.K., offering her a written apology for "not treating [her] right," "yelling at [her]," lying, telling her to return to her ex-boyfriend, and failing to quit using marijuana.

In 2017, when X.K. was eight months pregnant with the parties' daughter, M.C. pulled her away from the front of his car as they argued and she fell to the ground. M.C. "grabbed [X.K.] by [her] ankles, lifted [her] off the ground, and put [her] on the sidewalk." Another time, M.C. "slapped the

2

back of [X.K.'s] head" after getting angry with her, and her head hurt for days. M.C. also forced X.K. to have sex with him a few times within 42 days after she gave birth even though she told him she did not want to have sex.

In 2018, while the parties lived in China, M.C. strangled X.K. once with both hands. In 2019, M.C. punched X.K.'s shoulder so hard that he left bruises. X.K. attached to her DVRO request photographs of the bruising to her shoulder and arm from the 2019 punch. Also while in China in 2019, M.C. sent X.K. a message on social media telling her that he wanted a divorce. He wrote, "You think about sucide [sic] and I think about murder. It's so wrong . . . . we are general good people and deserve to be genuenly [sic] happy."

When X.K. and J.K.C. returned to California in December 2022, they resided with M.C. at his parents' house. M.C. did not physically abuse X.K. after she moved back to California. However, M.C. and his father insisted that X.K. follow M.C.'s parents' rules, which included X.K. being home every night. M.C. threatened to divorce X.K. many times, and he also "threatened that if [X.K.] did not follow the rules . . . [she] would be out in a week and [she] would not be able to take [J.K.C.]" with her. M.C. refused to let X.K. use his car, so she could only take jobs within walking distance of his parents' home. M.C.'s father told X.K. she was nothing. M.C. and his parents also called two family meetings to insist that X.K. work less so that she would be home to put J.K.C. to bed every night.

One time, M.C. got very angry and demanded that X.K. stop "brainwash[ing]" J.K.C. and that J.K.C. say she was American and not Chinese; M.C. picked up a kettle from the counter during this incident and threw it in the sink, making a loud noise. Both X.K. and J.K.C. cried.

3

The trial court denied X.K.'s ex parte request for a temporary restraining order (TRO) on August 29, 2023, stating that the "events described were not recent" and X.K.'s "declaration did not give sufficient reason for the court to restrain" the conduct of M.C. The court set the matter for a hearing.

At the evidentiary hearing, M.C. was present with counsel and X.K. represented herself. After the parties met with a mediator, the court heard the matter. The court took appearances, stated on the record that the mediator had recommended that M.C. receive visitation on Sundays, and then asked X.K. to address her request for a DVRO and the mediator's custody recommendation.

X.K. testified that M.C. had abused her for a long time; he had physically hit her, verbally abused her, and sexually abused her, as she explained in her request for a DVRO. X.K. then stated that she brought her daughter to the United States for a better education, but, once here, M.C. emotionally and financially abused her, so she had to leave.

X.K. relayed that, while the parties resided in China, when M.C. first left their apartment, he took X.K.'s and J.K.C.'s passports and X.K.'s Chinese identification and only returned the documents after X.K. called the police. X.K. also explained that she had to take a job while the parties lived in China after M.C.'s work slowed due to the COVID pandemic, but M.C. got mad that she worked too much and demanded she be home to care for J.K.C.

X.K. further testified that M.C. constantly changed his mind on whether he would assist her in applying for a U.S. green card. He said when she was in China with J.K.C. that he "might apply" if she brought J.K.C. back to the United States. Then, after X.K. came to California, M.C. continued to vacillate between telling her he "might" apply for her and he

4

"couldn't apply" or "couldn't send" the application. She testified that she told her parents and her father-in-law she needed a psychologist to help her deal with this. M.C. finally told her: "You should just go back to China without [J.K.C.]" and "[l]eave our daughter here." This made her "super-worried." Even after she received her work permit, X.K. was only allowed to work while J.K.C. was at school.

M.C. made derogatory remarks to X.K. about China, and he refused to help X.K. get a working cell phone when she was in the United States; American SIM cards did not work with her Chinese phone, so X.K. was limited to using her phone on the internet until she realized that she could use her American SIM card with one of M.C.'s old cell phones. M.C. refused to put X.K. on his health insurance. M.C. also sometimes refused to speak to X.K. while they resided at his parents' house, and she had to ask his father for help "negotiat[ing]" with M.C.

M.C. also yelled at X.K. in front of their daughter and once took X.K.'s breakfast away, stating, "No breakfast for you." X.K. felt that the situation was "getting very close" to M.C. physically abusing her again.

On August 20, 2023, X.K. and J.K.C. sought safety at a domestic violence shelter. X.K. left because her in-laws were going on vacation, and she felt that, without them present, M.C. would hurt or kill her. She testified that she was very stressed out by the mental and financial abuse, which was always present, and she felt no hope in that house. A couple of days after X.K. left, M.C. and his parents confronted X.K. aggressively at the courthouse. Also after she left, her father-in-law contacted her and told her he had dropped her belongings off at the shelter where she was staying, and he sent her a picture of herself in front of the shelter. This scared her and

5

alarmed shelter staff because the shelter's location was supposed to be confidential, and X.K. did not know who had followed her.

In addition to the above, X.K. testified that J.K.C. was new to the United States and needed time to adjust, M.C. was too harsh with J.K.C., M.C. would not play "girls" games with his daughter, X.K. disagreed with how M.C. disciplined J.K.C., M.C. had refused to let J.K.C. visit and did not provide financial support after he moved back to the United States, and M.C. did not spend much time with J.K.C. after he moved out of the parties' residence in China. She also stated that her in-laws would not tolerate anyone who thought differently than they thought, and they demanded to be obeyed.

M.C. did not file a response to the DVRO request or provide testimony at the hearing; his counsel, however, stated that M.C.'s version of events was "completely different," counsel argued against the mediator's visitation recommendation, and counsel sought and received increased visitation for M.C.

With respect to the DVRO request, the court ruled as follows:

"What sticks out in our discussion today is that the vast, vast majority of this discussion has been regarding custody and visitation issues and that being the foundation of the dispute between the parents.

"And while there may be disagreements with the parents regarding custody and visitation, parenting time, et cetera, that doesn't fall under the definition of what is domestic violence. This is a dispute over custody and visitation, and obviously, that plays into the initial denial of the temporary restraining order request.

"Although it doesn't really factor into my determination on this, I am wondering–this is probably more of an academic wondering than anything

6

else. Allegations about things that happened–I don't want to make it sound like a long time ago, but multiple years ago in China, I'm wondering what, if any, jurisdiction this Court has over those issues.

"So I am going to deny the request for the restraining order."

## DISCUSSION

*Governing Law and Standard of Review*

The purpose of the DVPA "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) The petitioner must present "reasonable proof of a past act or acts of abuse," and the standard of proof is by a preponderance of the evidence. (§ 6300, subd. (a); *Hatley v. Southard* (2023) 94 Cal.App.5th 579, 592 (*Hatley*).) " 'Domestic violence' " includes abuse of a spouse or former spouse. (§ 6211, subd. (a).) " 'Abuse' " includes intentionally or recklessly causing or attempting to cause bodily injury (§ 6203, subd. (a)(1)); placing a person in reasonable apprehension of imminent serious bodily injury (§ 6203, subd. (a)(3)); and "behavior that has been or could be enjoined pursuant to [s]ection 6320." (§ 6203 subd. (a)(4).) Behaviors that can be enjoined under section 6320 include "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering . . . harassing, telephoning . . . or disturbing the peace of the other party." (§ 6320, subds. (a), (c).)

The last phrase, "disturbing the peace," is itself a broad category of abuse under the DVPA. The term "refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly . . . and by any method . . . . This conduct includes, but is not limited to, coercive control,

7

which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (§ 6320, subd. (c).) Coercive control includes unreasonably engaging in conduct aimed at, among other things: "(1) Isolating the other party from friends, relatives, or other sources of support[;] [¶] (2) Depriving the other party of basic necessities[;] [¶] [and] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services." (§ 6320, subd. (c)(1)–(3).)

We review an order granting or denying a DVRO for abuse of discretion. (*Hatley*, *supra*, 94 Cal.App.5th at p. 589.) "However, ' "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the ' "legal principles governing the subject of [the] action . . . ." ' " [Citation.] Thus, "we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose." [Citation.] " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review." ' " (*Id.* at p. 590.)

*Analysis*

8

X.K. contends that the trial court prejudicially abused its discretion in many ways when it denied her DVRO request. We find merit in some of her contentions.

When viewed as a whole, the record shows that the trial court erred either in its understanding of the definition of "abuse" under the DVPA, or in denying the DVRO simply because the request occurred in the context of a dispute involving custody and visitation, or both. X.K. submitted evidence that, if credited, could constitute physical abuse (M.C. slapped her head and pulled her away from the car and lifted her by her ankles)[2], sexual abuse, and conduct that disturbed her peace. (§§ 6203, subd. (a)(1), (2), (4), 6320, subds. (a), (c).) With respect to the last category, for example, X.K. testified to a number of acts that she said left her feeling hopeless and "very stressed out": M.C. required X.K. to follow his family's rules, including being home every night and working only when J.K.C. was at school; M.C. threatened to kick her out and keep J.K.C. if X.K. did not follow the rules; M.C. refused to let X.K. use his car, so she could only take jobs within walking distance; M.C. said he might help X.K. apply for a green card if she brought J.K.C. to California, but later refused to help her apply; M.C. refused to put X.K. on his insurance or help her get a working cell phone; and M.C. refused to talk to X.K. and took her breakfast away on one occasion. (See § 6320, subd. (c)(1), (3) [coercive control includes unreasonably isolating party and controlling, regulating, or monitoring her movements, daily behavior, finances, and economic resources].) X.K. testified that M.C.'s conduct caused her stress and worry, and she wanted to see a psychologist.

---

[2] For the reasons set forth, *post*, we do not decide whether conduct that occurred when the parties were living in China constitutes "abuse" regulated by the DVPA.

In the face of this submission, the trial court ruled, "What sticks out in our discussion today is that the vast, vast majority of this discussion has been regarding custody and visitation issues and that being the foundation of the dispute between the parents. [¶] And while there may be disagreements with the parents regarding custody and visitation, parenting time, et cetera, that doesn't fall under the definition of what is domestic violence. This is a dispute over custody and visitation, and obviously, that plays into the initial denial of the temporary restraining order request."

This formulation of the ruling leads us to conclude the court committed legal error. The court was free to discredit X.K.'s facially sufficient evidence of abuse at the evidentiary hearing, but the court did not make an express credibility finding and the record does not support the conclusion that the court made an implied finding. Instead, the record shows that the court accepted that X.K.'s testimony established the parties had custody and visitation disagreements, but denied the DVRO expressly because it considered this to be merely a dispute over custody and visitation that did not "fall under the definition of what is domestic violence." The court also indicated that this reason for the denial carried over from the TRO denial, and the court did not list a lack of credibility as a basis for the TRO denial. (§ 6320.5, subd. (a) [order denying ex parte request for DVRO shall include reasons for denial].) The trial court's comments during its ruling lead us to conclude that it erred–either by applying an erroneous definition of abuse under the DVPA, or by improperly denying the DVRO because the allegations of abuse occurred in the context of a marital dissolution action involving custody and visitation, or both. (§ 6221, subd. (a) [DVRO may issue in marital dissolution action]; §§ 6203, 6320 [abuse includes intentional or reckless infliction of bodily injury, sexual assault, and conduct disturbing

10

peace of other party]; see *In re Marriage of A.M. & R.Y.* (2025) 110 Cal.App.5th 1115, 1130 ["[A]bsent a sufficient basis for finding that [petitioner's] allegations of abuse were not credible, the trial court's explanation that the alleged abuse occurred in the context of disputes over 'dissolution and child custody/visitation' was not a proper reason to deny the DVTRO"].)

The trial court's error was prejudicial. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 118 [prejudice is established by a reasonable probability of a more favorable result absent error].) If credited, X.K.'s allegations could have established past acts of physical and sexual abuse and conduct that disturbed X.K.'s peace under the DVPA. (See *ibid.* [prejudicial error found where court refused to consider evidence of abuse occurring after filing of DVRO request that, if credited, could have established abuse sufficient to support issuance of DVRO].) On this record, there is a reasonable probability of a more favorable ruling had the trial court found the allegations of abuse to be credible and legally sufficient to support issuance of a DVRO.

X.K. also argues that evidence of certain incidents that occurred in China constituted "abuse" under the DVPA, and the trial court questioned "what, if any, jurisdiction" it had over those issues when it should have considered this "abuse" in China. We see this argument as implicating two potential issues. The first potential issue is whether M.C.'s conduct in China while the parties were living there constitutes "abuse" regulated by the DVPA that itself could justify the issuance of a DVRO. The second potential issue is whether, regardless of whether the incidents in China constituted "abuse" regulated by the DVPA, the trial court erred by failing to understand that it must consider the totality of the circumstances, including the

11

incidents in China, when assessing whether M.C.'s conduct in California disturbed X.K.'s peace (§ 6320, subd. (c)) and in determining whether it should issue a DVRO based on the alleged past acts of abuse in California (§ 6301, subd. (d)).

With respect to the latter issue, the DVPA states, "The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief." (§ 6301, subd. (d).) And " 'disturbing the peace of the other party' refers to conduct that, *based on the totality of the circumstances*, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c), italics added.) Under these authorities, the court should have considered the totality of the circumstances, including evidence of the incidents in China, when assessing whether M.C.'s more recent conduct in California constituted abuse in the form of disturbing X.K.'s peace and in its "totality of the circumstances" assessment in determining whether to grant or deny X.K.'s petition based on acts of abuse in California.

As to the question of whether conduct that occurred wholly in China while both parties were living there itself constitutes "abuse" under the DPVA, we find this issue forfeited because X.K. did not support her argument with comprehensible legal analysis with citations to pertinent authority. (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 853.)

X.K. asserts in her brief that "the DVPA does not contain any locus requirement, meaning California courts have authority to issue restraining orders regardless of where acts of abuse took place, so long as the DVRO petitioner presents 'reasonable proof of a past act or acts of abuse.' " As statutory authority, she cites only section 6300, subdivision (a), which does

12

not speak to the issue.[3]  And X.K. ignores entirely the presumption under California law that "the Legislature did not intend a statute to be ' "operative, with respect to occurrences outside the state, . . . unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.' " ' " (*Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1207 [Bus. & Prof. Code, § 17200 et seq. does not operate extraterritorially].)  X.K. does not cite authorities discussing this presumption, she does not discuss in any detail the provisions of the DVPA or its legislative history, and she does not provide any meaningful legal analysis to show that the DVPA extends to the conduct at issue in China.[4]  Ultimately, we find it inappropriate to address this issue in the absence of meaningful legal analysis and argument discussing pertinent authority, and we deem the issue forfeited.

Finally, although X.K. requests that we remand with directions to enter a DVRO, we conclude the appropriate relief here is to remand with instructions for the trial court to conduct a new hearing consistent with this opinion because the trial court is best situated to exercise discretion to grant or deny the DVRO request after evaluating the credibility of the parties and weighing the evidence.  (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 118 [remanding case for new DVRO hearing where court prejudicially failed to consider evidence of abuse occurring after filing of

---

[3] This provision states, "An order may be issued under this part to restrain any person for the purpose specified in Section 6220, if an affidavit or testimony and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.  The court may issue an order under this part based solely on the affidavit or testimony of the person requesting the restraining order."

[4] The few cases that X.K. cites do not squarely address the issue.

13

DVRO request that, if credited, could warrant issuance of DVRO]; see also *Hatley*, *supra*, 94 Cal.App.5th at pp. 592–594 [remanding for new DVRO hearing where court misunderstood statutory definition of abuse].) In the new hearing, the court is to consider the evidence of abuse presented by X.K., to apply the proper definition of "abuse" under the DVPA, and to assess whether it should exercise its discretion under the DVPA to issue a DVRO.[5]

## DISPOSITION

We reverse the trial court's order and remand the matter for a new hearing on X.K.'s DVRO request consistent with the DVPA and the views expressed in this opinion.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

---

[5] We need not reach X.K.'s claim that we should reverse the order denying her a DVRO on the ground that the judge violated her right to due process by failing to provide sufficient assistance to her as a self-represented party. Courts have recognized that, because litigants in most DVRO cases are not represented by counsel, that should "influence[ ] how these hearings should be conducted—with the judge necessarily expected to play a far more active role in developing the facts, before then making the decision whether or not to issue the requested permanent protective order. In such a hearing, the judge cannot rely on the propria persona litigants to know each of the procedural steps, to raise objections, to ask all the relevant questions of witnesses, and to otherwise protect their due process rights." (*Ross v. Figueroa* (2006) 139 Cal.App.4th 856, 861, fn. omitted.) X.K. is represented by counsel in this appeal, but if she lacks counsel after remand, that should influence how the trial court conducts future hearings.

14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| X.K.,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>M.C.,<br><br>     Defendant and Respondent. | A170020<br><br>(Sonoma County Super. Ct. No. SFL094325)<br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The requests for publication of this court's June 25, 2025 opinion are granted, and it is hereby ordered that said opinion be published in the Official Reports.

Dated: _____

                             BROWN, P.J.

| | |
|---|---|
| Trial Court: | Sonoma County |
| Trial Judge: | Hon. James G. Bertoli |
| Counsel for Appellants: | Hanson Bridgett LLP |
| | Patrick Burns |
| | Zahra A. Bocek |
| | Family Violence Appellate Project |
| | Shuray S. Ghorishi |
| | Judith C. Lewis |
| | Jennafer D. Wagner |

No appearance for respondent

*X.K. v. M.C.* (A170020)