Filed 1/12/21  Marriage of Yoozbashizadeh CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re the Marriage of DOLLY and MAHDI YOOZBASHIZADEH,<br><br>DOLLY KIOSEA,<br><br>    Appellant,<br><br>      v.<br><br>MAHDI YOOZBASHIZADEH,<br><br>    Respondent. | G058032<br><br>(Super. Ct. No. 18D005119)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Nathan Vu, Judge.  Affirmed.

Dolly Kiosea, in pro. per., for Appellant.

No appearance for Respondent.

\*       \*       \*

Dolly Kiosea (formerly Yoozbashizadeh) appeals from the trial court's order denying her petition for a permanent restraining order against her former husband, Mahdi Yoozbashizadeh. Kiosea contends the court erred in several respects. First, she claims the court abused its discretion in determining that a chain of messages sent to her by Yoozbashizadeh in the span of less than four hours on a single day did not qualify as abuse. Second, she contends the court abused its discretion by refusing to consider all of Yoozbashizadeh's alleged prior acts of abuse in deciding whether to issue the requested restraining order. And third, she contends the court abused its discretion by finding no abuse occurred, despite the issuance of a restraining order in 2014.

The State of California takes allegations of domestic violence seriously, as do we. Nonetheless, we affirm the court's order. In each of her arguments, Kiosea conflates the court's discretion to issue a restraining order with its obligation to do so. They are not the same thing.

The message chain Kiosea complains about is a back and forth, not a one way barrage from Yoozbashizadeh. And while we might agree that the exchange of messages "disturbed her peace" and perhaps his as well—the court was not obligated to issue a restraining order on that basis. As the trial court observed, "[t]he fact that a divorcing couple have arguments with each other does not constitute abuse under the Domestic Violence Prevention Act."

Nor was the court obligated to readjudicate prior behavior that had been previously considered by other courts and found insufficient to justify any of Kiosea's earlier petitions for restraining orders.[1] The court has discretion to consider whether past incidents shed a light on the present need for a restraining order; there is no blanket

---

[1] The court noted Kiosea had filed seven other domestic violence restraining order requests following the expiration of the initial one-year restraining order that was issued in 2014. Apparently, none of these requests was granted.

2

requirement that the court must allow the petitioning party to relitigate allegations underlying past petitions.

Finally, the fact that a court found sufficient cause to issue a one-year restraining order in 2014 does not require the court to issue a new restraining order in 2019.

We conclude the trial court exercised proper discretion in denying Kiosea's petition; it also exercised great patience with both parties and demonstrated understandable concern for their vulnerable children.

**FACTS**

Kiosea filed her request for a domestic violence restraining order on May 17, 2019. She sought a restraining order preventing Yoozbashizadeh from having any contact with her and the couple's children.

Kiosea asserted that on May 15, 2019, Yoozbashizadeh "stalked" her at their children's school on her pick up day, and stated she had received "several messages from Mr. Yoozbashizadeh that he had hired someone to stalk me and threatening to legally abuse me by filing a false OSC for contempt." After giving Yoozbashizadeh notice she intended to seek a restraining order, she stated she received this text message: "file that restraining order you stupid bitch and I'll kill you, no one is going to believe you anyways." Kiosea claimed Yoozbashizadeh "has a history of stalking me, so I packed up our children and went to stay with my parents and abandoned my apartment in Newport Beach."

She argued the children were also in need of protection because they "have endured almost 5 years of neglect and emotional abuse in their father's custody." Kiosea claimed Yoozbashizadeh "fails to provide clothing, shoes and a hygienic environment," which has meant "our children are always sick, they have been infected with fungal infections and have sustained injuries in his care."

3

Additionally, Kiosea suggested, in conclusory terms, that Yoozbashizadeh had committed prior bad acts that included two incidents of alleged abuse in 2014 and three in 2017, a history of threatening to "kidnap our children to Iran so that I would never see them," failures in childcare over the course of the previous five years, and various incidents of litigation misconduct.

The court granted a temporary restraining order with respect to Kiosea only, finding no evidence demonstrating an emergency need for protection of the children. The court observed in its order that Kiosea's "allegations other than most recent ones have been made and rejected in the past or withdrawn."

The court set a hearing on the requested restraining order for June 5, 2019.

Kiosea filed a "supplemental declaration" a week before the hearing in which she disputed the court's finding in the temporary restraining order that her past allegations against Yoozbashizadeh had been withdrawn. She asserted that she has "never 'withdrawn' any allegations of domestic violence."

Kiosea did acknowledge that she had sought several restraining orders against Yoozbashizadeh in the past, noting her request in 2014 had been granted, while asserting that all of her requests "from 2016 to the present day" were "improperly denied." She requested that the court "carefully review the ENTIRE record and history of abuse," and grant her "a permanent 5 year domestic violence restraining order . . . as well as sole legal and physical custody of our minor children . . . ."

Kiosea attached exhibits to her declaration which document the parties' troubled relationship and mutual hostility. The exhibits fail to support her attempt to portray Yoozbashizadeh as the sole source of the problem.[2]

---

[2] For example, Kiosea largely relied on a text exchange attached as exhibit 3 to her declaration to prove that Yoozbashizadeh struck her in 2014. The exchange reflects that he admitted hitting her "gently to stop [her] hitting [him]." It also reflects that she replied by claiming she "gently grazed [him] and [he] pushed [her]." That exchange reflects the complex dynamic at work here. Kiosea also relies on exhibit 4,

The most recent incidents of alleged abuse were evidenced by a series of messages Yoozbashizadeh had sent to Kiosea on May 15, 2019, "stating that he had hired someone to follow me and stalk me," plus a follow-up text (from an "incomplete number") containing the threat to kill her if she filed her request for a restraining order. Since the specific substance of these messages is critical to Kiosea's appeal, we summarize their content in some detail. Each message was sent via a portal called "Talking Parents."

At 8:10 a.m., Kiosea emailed Yoozbashizadeh, telling him she did not agree with the pediatrician he selected for the children and, because he selected an out-of-network doctor, she refused to be responsible for paying the cost of the medical treatment.

At 8:17 a.m., Yoozbashizadeh emailed Kiosea, telling her she agreed to the pediatrician, was informed of the appointments in advance, and there was a court order requiring her to pay half of all medical bills.

At 8:59 a.m., Kiosea responded, stating there was a court order requiring Yoozbashizadeh to pay the medical bills because he chose an out of network provider. She informed him that if he wanted to set a hearing, she could bring all her receipts for the "kids clothing, shoes, haircuts and glasses [she] kept for the last 2 years . . . and we can just have the judge enter a ruling."

At 9:07 a.m., Yoozbashizadeh told Kiosea there was a court order in place requiring her to pay half of the children's medical bills, and also an order requiring her to keep him apprised of her place of residence. He added he had been informed by his

which she characterizes as a "copy of the custody evaluation from 2018 in which Mr. Yoozbashizadeh admits to hitting me . . . ." That document does not include the entirety of Yoozbashizadeh's admission, but the portion Kiosea provides reflects that he "acknowledged holding the mother's hand and slapping her body *to get her to stop*." (Italics added.) The situation is similar in many of the exhibits.

"court process server" that she no longer lived in Newport Beach and she instead took the children to a Beverly Hills apartment for her custody visitation. He reminded her that he made a request on April 11, 2019, through Talking Parents, that she notify him of her current place of residence, but she had not responded.

At 9:14 a.m., Yoozbashizadeh stated again that there were no court orders in place requiring that he pay all the medical bills. Instead, the court's order was that they be shared.

At 9:17 a.m., Kiosea responded that she had already informed him that her place of residence had not changed. She stated she and the children "spend our weekends outside of [O]range [C]ounty, and *mostly* at my mom and dad[']s house which is located in Granada Hills." (Italics added.) She offered to provide Yoozbashizadeh that address. She insisted that a process server could not have been the person that informed him of anything as he had no motions on calendar and thus no reason to serve her with any papers. She told him that his refusal to "pay child support, disclose [his] income, or pay for the children's clothing, shoes, haircuts and glasses" would obligate her to move to student housing, and when she had done that, she would send him her address. She warned him that "if you are stalking me in order to make false claims, please note that your confirmation of such will be taken very seriously and addressed with Court." She also warned Yoozbashizadeh, "[p]lease do not send me a dozen emails a day with the intent to harass and annoy me. [¶] Please refrain from stalking me both physically in person and on social media which the children have informed me of."

At 9:21 a.m., Yoozbashizadeh responded, asking Kiosea to "[p]lease notify me where to serve you with my RFO for contempt and for enforcing court orders. . . . I don't know where to serve you with my court documents."

At 9:34 a.m., Kiosea replied that in September 2018, after he requested to take the children to an out-of-network provider and she replied she couldn't afford it, the court issued an order stating that he could do that as long as he paid for it. Kiosea then

added that she had asked Yoozbashizadeh "to refrain from sending me a dozen messages with the same information with the intent to harass me and refrain from stalking me both online and in person as you have a proven history of doing so, in order to make false allegations and file fraudulent documents."

At 11:09 a.m., Yoozbashizadeh responded, "[y]ou currently reside in Beverly Hills" and asked her again to send him the address "so I know where the children stay." He stated he did not approve of her moving out of Orange County. He told her that as a consequence, he was filing a request for an order regarding this violation. He reiterated that he has "retained a 3rd party investigator and they informed me that the children commute to Beverly Hills during the custody time with you."

At 11:32 a.m., Kiosea replied that "based on the message you just sent me, I will be going in Friday morning . . . to request a restraining order for your continuous stalking." She also warned him that "if you do file your RFO, I will retain counsel and seek sanctions and attorneys fees against you for your continuous fraudulent and false filings."

At 11:36 a.m., Kiosea sent a follow-up message requesting that Yoozbashizadeh "let [her] know if you plan to appear and oppose [her] request for [a] restraining order."

In the last message, at 11:42 a.m., Yoozbashizadeh confirmed he would "file my RFO and move forward with [the] contempt order. He accused her of filing "false [restraining orders] to cover [her] multiple contempt of court orders." He reiterated that he had been informed "though a 3rd party" that the children were living in Beverly Hills with her, and that he had a right to know where the children were staying. He indicated he intended to "ask the judge to force you to come back to Newport Beach."

Kiosea claimed it was later that same day that she received this text from an unidentified number: "file that restraining order you stupid bitch and I'll kill you, no one is going to believe you anyways."

7

Paragraph 18 of Kiosea's supplemental declaration set forth a list of Yoozbashizadeh's alleged parenting offenses, which were unrelated to her domestic abuse claim. In paragraph 35, she cited *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, for the proposition that a finding of domestic abuse sufficient to support a domestic violence restraining order necessarily triggers the presumption in Family Code section 3044 against awarding joint or sole custody to the perpetrator.

Thereafter, she focused her declaration on the custody issue, arguing that it is not in the children's best interests to allow Yoozbashizadeh to share custody because "he has continuously neglected them, refuses to properly care for them and uses them as a tool of harming [her]."

Yoozbashizadeh filed an opposition to the requested restraining order, denying Kiosea's allegations of stalking and harassment. He asked that she be declared a vexatious litigant based on her repeated frivolous motions. Kiosea replied by claiming that Yoozbashizadeh's declaration in support of his opposition was "an act of domestic violence against [her]."

At the outset of the hearing, the court admonished the parties to focus on the most recent allegations of abuse because it was unwilling to "relitigate matters that have already been litigated." Kiosea's counsel objected, noting there was no requirement that past acts of abuse must have occurred within a specified period to be relevant. The court then indicated it "was aware of the allegations" and would "consider [them]," but it would not conduct a "multi-day trial on things that have been alleged in court filings and/or litigated and ruled on by prior courts."

Both parties testified.[3] The court then observed: "at this point there isn't sufficient evidence to show abuse under the Domestic Violence Prevention Act. [¶] The

---

[3] Yoozbashizadeh produced a witness, a dinner receipt, and GPS tracking data from his phone which suggested he was at Cal State Long Beach, where he works, and not at the children's elementary school, at the time Kiosea claimed to have seen him

DVPA doesn't prohibit anything that petitioner happens to object to." At that point, the court invited Yoozbashizadeh to submit questions to Kiosea about her present address, and stated that Kiosea would also be allowed to "ask [Yoozbashizadeh] questions on this issue of determining her address and filing the OSC re: contempt."

Kiosea's counsel chose instead to cross-examine Yoozbashizadeh about the stalking allegations. Yoozbashizadeh explained he had attempted to locate Kiosea because he wanted to serve her with an order to show cause re contempt. He testified she had reported to the court, only four months earlier, that she was moving to Orange County in a bid to get custody; Yoozbashizadeh claimed Kiosea had deceived the court by moving back to Beverly Hills and not letting anyone know. He believed that she fabricated her stalking claim in order to deflect attention from her deceit.

After allowing Kiosea's counsel to question Yoozbashizadeh regarding the details of his efforts to determine Kiosea's location, the court ended the inquiry, noting that Yoozbashizadeh had the right to determine her address "consistent with his obligations to serve her and consistent with the prior court orders on custody and visitation."

Kiosea's counsel also questioned Yoozbashizadeh about the text containing the threat to kill her; Yoozbashizadeh denied any knowledge of the text.

The matter was submitted. The court then denied the requested restraining order finding that Kiosea had not met her burden of proving abuse.

The court found that Kiosea had failed to prove Yoozbashizadeh was at the children's school on May 15, 2019, as she claimed, and that even if he were, it would not have qualified as an act of abuse. The court found that the alleged third-party stalking was instead a legitimate effort by Yoozbashizadeh to determine Kiosea's address for

_____

"look[ing] at me." Yoozbashizadeh also testified that the couple's children were telling him they had "moved to Beverly Hills" and were "no longer liv[ing] in Newport Beach."

9

lawful purposes. The court also found that Yoozbashizadeh's statement that he intended to file an OSC re contempt or a request for an order regarding custody did not amount to abuse.

The court found the evidence insufficient to prove Yoozbashizadeh sent the threatening text to Kiosea, and stated that all of the other allegations either did not amount to abuse or had been litigated and resolved by courts in the past.

The court noted that the restraining order issued in 2014 had a duration of only one year, "which is the shortest amount of time that a DVRO can be issued." The court also noted that since the expiration of that initial restraining order, Kiosea had filed an additional eight requests for restraining orders—including this one—all of which were unsuccessful. The court nonetheless denied Yoozbashizadeh's request for a declaration that Kiosea was a vexatious litigant because the request was not made in a properly noticed motion.

The court emphasized that the evidence before it demonstrated "there's an intensely high level of conflict" between the parties, and that "[b]oth parties have been equally involved in this conflict." The court stated that "neither party [is] appearing in their conversations to be dominated by or harassed or threatened by the other party in this case. Instead, responding in equal measure."

The court then warned the parties that the children were now reaching ages where the high level of conflict becomes an issue, and that if the parties did not alter their behavior, "it may come down to the court simply awarding sole legal/sole physical custody with no visitation by the other parent for the best interest of the children here. One of you is going to be very unhappy with that."

**DISCUSSION**

1. *Burden of Proof and Standard of Review*

The Domestic Violence Prevention Act (DVPA) (Fam. Code,[4] § 6200 et seq.) authorizes a court to issue a protective order to prevent a recurrence of domestic violence or abuse. (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 200.) The DVPA broadly defines abuse to include not only acts causing bodily injury, but also acts placing a person in apprehension of injury, harassment, and disturbing a domestic partner's peace. (§§ 6203, subd. (a) & 6320, subd. (a); *Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 852.)

"We review issuance of a protective order for abuse of discretion, and the factual findings necessary to support the protective order are reviewed for substantial evidence. [Citation.] 'We resolve all conflicts in the evidence in favor of respondent, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings.'" (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1226, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Under the substantial evidence standard, "[o]ur task '*begins* and *ends* with the determination as to whether, on *the entire record*, there is substantial evidence, contradicted or uncontradicted,'" that supports the challenged order. (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 1000.)

Where, as here, the trial court determines that the party with the burden of proof failed to carry that burden, we may reverse the decision only if we determine "'the evidence compels a finding in favor of the appellant as a matter of law.'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*); *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) Under this standard, a finding is compelled only if the appellant's evidence

---

[4] All further undesignated statutory references are to this code.

was "'(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Dreyer's, supra*, at p. 838.) In connection with the latter point, we note that a trier of fact may discredit the testimony of a witness even if it is uncontested. (*LandWatch San Luis Obispo County v. Cambria Community Services Dist*. (2018) 25 Cal.App.5th 638, 643; *Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 857.)

        2.     *The May 15 Messages*

Kiosea first focuses on the May 15 messages sent by Yoozbashizadeh "in a less than 4 hour window." She argues that these messages, standing alone, are "sufficient to issue a restraining order," and thus that the trial court was required to do so. We disagree.

First, we note that Kiosea inaccurately summarized these messages, both in the trial court and in her brief on appeal. The messages reflect a back-and-forth between the parties, with Kiosea an equal participant in the conversation. The conversation was not an especially pleasant one, to be sure, but it was not one unilaterally inflicted upon Kiosea by Yoozbashizadeh.

We reject Kiosea's assertion that because the DVPA authorizes the issuance of a restraining order against a party who "disturbs the peace" of another, the fact that hers may have been disturbed by the exchange meant that issuance of a restraining order was mandatory here. As the court explained in *Curico v. Pels* (2020) 47 Cal.App.5th 1 (*Curico*), not every act that upsets the petitioning party will justify a restraining order. "The DVPA was not enacted to address all disputes between former couples, or to create an alternative forum for resolution of every dispute between such individuals." (*Id.* at p. 13.) Thus, while the *Curico* court acknowledged that the petitioner in that case "understandably was upset by [the respondent's] social media post and it may have made her fear for her career," it nonetheless reversed the trial court's

12

order granting a restraining order. (*Ibid.*) The issuance of a restraining order remains a discretionary act.

We find guidance in cases which involve facts we see as more egregious than those presented here, such as *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416. There the husband downloaded "tens of thousands of text messages" from his wife's cell phones, as well as information from the "'notes' section of [her] iPhone, which [she] used as a diary," and then filed copies of some of the downloaded messages with the court during the couple's dissolution proceedings. (*Id*. at p. 1420.) The wife also claimed the husband transmitted private text communications to third parties, had "hacked into her Facebook account, changed her password, and rerouted the e-mail associated with her Facebook account to his own account," and "threatened to reveal publicly more text messages and e-mails for leverage in the dissolution proceedings." (*Id*. at p. 1421.) The issuance of a restraining order based on these facts was sustained on appeal.

Likewise, in *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, the respondent refused to accept the petitioner's termination of their relationship, or heed her repeated requests that he stop contacting her. Instead, "[h]is communications were inappropriate and contained sexual innuendos. She constantly turned down his overtures and requested that he stop contacting her and each time he would get angry." (*Id.* at p. 1142.) He continued to send her both texts and emails, and later appeared at her residence, "unannounced and uninvited," and became angry when she asked him to leave. (*Ibid*.) "She was afraid of what he was going to do, and said, 'Please leave, I'm scared. I will call the police. And that's when he shouted at me through my door window, I want to see you do that.'" (*Id.* at pp. 1142-1143.) The respondent thereafter "paced around her porch for about 10 minutes," but finally departed before the police arrived. (*Id.* at p. 1143.) Moreover, "[o]n two prior occasions during their relationship when he had

13

gotten angry he became physical with her." (*Ibid.*) Once again, the issuance of a restraining order under these circumstances was sustained on appeal.

In any event, even if the parties' message exchange, in theory, provided sufficient evidence to support the issuance of a restraining order here, that would not mean the trial court was automatically obligated to issue it. When the law invests the court with discretion, the court has latitude to exercise judgment in the matter—which implies that not every court will necessarily reach the same conclusion. Thus, a decision that is grounded in the court's discretion will only be reversed when a ""'trial court exercise[s] its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*People v. Jones* (2013) 57 Cal.4th 899, 924; see *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 [court abuses its discretion when its ruling "exceed[s] the bounds of reason"].) On appeal Kiosea is therefore required to establish not only that the trial court *could have* issued her requested restraining order on the basis of the May 15 exchange of messages, but also that no reasonable court would have refused to do so under the circumstances of this case. That is a far more stringent standard, one that Kiosea has failed to satisfy.

3.    *The Court's Purported Refusal to Consider Past Bad Acts*

Kiosea claims the court abused its discretion by "failing to consider all past acts of abuse . . . ." She points out that she "not only testified about past acts of abuse perpetrated by [Yoozbashizadeh], but provided a preponderance of evidence attached as exhibits to her supplemental declaration . . . ." We reject the claim.

Contrary to Kiosea's contention, the court made clear that it had reviewed the evidence related to past alleged bad acts committed by Yoozbashizadeh, and that it had considered them before ruling. What the court refused to do was devote days of court time to a re-airing of the parties' entire conflict-ridden history.

As the court explained, much (if not all) of that prior evidence had already been explored in support of Kiosea's seven other restraining order requests. She does not

14

dispute that point. Because we are obligated to draw all inferences in favor of the court's ruling, we presume the earlier incidents—with the exception of the incident(s) underlying the 2014 restraining order—were found insufficient to support those earlier requests. The court was not obligated to exhaustively relitigate those earlier incidents. As the trial court said, it "was aware of the allegations" and it would "consider [them]" before ruling. We presume the court did exactly that.

As we have discussed, the exhibits submitted by Kiosea to support her claimed history of abuse did not inalterably support her assertion that Yoozbashizadeh was either the aggressor in incidents of abuse or the primary driver of conflict in their relationship. We find no abuse of discretion in the court's decision to limit the amount of court time it devoted to these claims.

4.      *Court's Finding that No Abuse Was Proved*

Finally, Kiosea argues that the court abused its discretion in finding that she failed to meet her burden of proving that an act of abuse, as defined in the DVPA, occurred in this case. According to Kiosea, the fact that a court found sufficient cause to issue a one-year restraining order against Yoozbashizadeh in 2014 necessarily establishes that she proved an act of abuse. Once again, we disagree.

The court's findings must be understood in the context of the issue before it. In this case, the issue before the court was whether to issue a permanent restraining order under the DVPA. Consequently, when the court stated that Kiosea had not met her burden of establishing an act of abuse, what it was referring to is an act of abuse sufficient to warrant the issuance of a restraining order in 2019. It was neither denying nor ignoring the existence of the 2014 order. Having reviewed the evidence ourselves, we find no basis to conclude the court failed to give the 2014 order appropriate attention.

Instead, the court concluded, in the exercise of its discretion, that no restraining order was warranted in 2019. We find no error in that conclusion.

15

## DISPOSITION

The order is affirmed.  Kiosea is to bear her own costs on appeal.  No other costs are awarded.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

16