Filed 2/5/24 (see dissenting opinion)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| M.A.,<br><br>　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>B.F.,<br><br>　　Defendant and Respondent. | G061598<br><br>(Super. Ct. No. 30-2020-01145489)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard J. Oberholzer, Judge.  Affirmed.

The Appellate Law Firm, Aaron Myers; and Mark Kuntze for Plaintiff and Appellant.

Law Office of Stefanie N. West and Stefanie N. West for Defendant and Respondent.

We are asked here to determine whether a relationship characterized in modern parlance — and by the plaintiff in this case — as "friends with benefits" constitutes a dating relationship under Family Code section 6210, so as to support a tort claim for domestic violence. Whether such a dating relationship exists is inherently a fact-intensive inquiry, not susceptible to resolution based on shorthand labels or descriptors. We therefore do not hold a "friends with benefits" relationship is necessarily a dating relationship or that it can never be one. We simply conclude, on the specific record before us, substantial evidence supports the trial court's finding that the relationship between plaintiff M.A. and defendant B.F. was not a dating relationship within the meaning of the relevant statutes.[1] We affirm.

FACTS

I.

M.A.'S COMPLAINT FOR DOMESTIC VIOLENCE, CIVIL CODE SECTION 1708.6

In May 2020, M.A. filed a complaint against B.F. alleging two causes of action: (1) domestic violence under Civil Code section 1708.6; and (2) sexual battery under Civil Code section 1708.5. According to the complaint, B.F. was driving M.A. in his car in July 2017. They were on their way to M.A.'s mother's apartment, where they intended to have sex. During the drive, B.F. kissed M.A. and asked if she liked it if he pulled her hair. Before M.A. could respond, B.F. grabbed M.A. by the back of her head and "violently whipped her head around in several different directions." M.A. heard the sound of bones cracking in her neck. M.A. saw a doctor the next day and was diagnosed with a concussion, muscle spasms, cervical whiplash, and cervicalgia (neck pain).

M.A. alleged she and B.F. were in a dating relationship before and on the date of the incident. Her complaint sought general, specific, and punitive damages, costs, and attorney fees, pursuant to Civil Code sections 1708.5 and 1708.6.

_____

[1] Although not requested to do so, out of respect for the parties' personal privacy interests, we refer to them by their initials. (Cal. Rules of Court, rule 8.90(b)(10).)

2

The trial court sustained B.F.'s demurrer to the second cause of action for sexual battery without leave to amend. The remaining cause of action, for domestic violence, proceeded to a bench trial.

## II.

### TRIAL TESTIMONY

M.A. called only two witnesses at trial: herself and a psychologist from the student psychological services office at the university she attended, who treated M.A. after the incident. B.F. did not testify and called no witnesses. We summarize the testimony below.

A. *M.A.'s Testimony*

M.A. was introduced to B.F. by a mutual friend in the spring of 2015 at a gym at the university they both attended. At the time, M.A. was a freshman and B.F. was a senior.

M.A. and B.F. did not see each other again until early October 2015, when they had a chance encounter at another gym. They talked, M.A. showed B.F. some yoga stretches, and he complimented her and "leaned in and gave [her] a kiss." They proceeded to kiss "a lot" at the gym that day. They exchanged telephone numbers, went their separate ways, and began to communicate through text messages.

Several weeks later, at the end of October 2015, M.A. and B.F. met at a gym and worked out together. B.F. invited M.A. back to his home, where they kissed and had oral sex. Afterwards, he dropped her off on campus. There is no evidence they spent any more time together that day after the sex. They continued to talk and text.

In mid-November 2015, B.F. again invited M.A. to his home. When she arrived, he was watching a television show. After they cuddled and kissed on the sofa for

a while, they again had oral sex.[2]  There is no evidence they continued to spend time together that evening after the sexual conduct concluded.

M.A. did not see B.F. again until February 2016, when they met up and talked and kissed in a hot tub.  They did not see each other during the three months between November 2015 and February 2016 because M.A. was too busy with school, press events, and dance.  But they "always" texted and talked during the three-month hiatus.  At some point during those three months, M.A. invited B.F. to her birthday party, but he told her he could not go.

The next time M.A. saw B.F. was in March 2016, when they met at a gym, worked out together, and kissed "a lot."  They continued to talk and text after that encounter, but they did not see each other again until August 2016, five months later.

In August 2016, M.A. went to a local boxing match where B.F. was fighting.  M.A. obtained a media pass to cover the event and went with her mother.  Other students from their university were also there.  While at the match, M.A. met B.F.'s mother and took a photograph with her.  M.A. and B.F. did not kiss at the match.  Nor did M.A. hang out with B.F. after the match or go to dinner with him to celebrate his victory.  M.A. left the match with her mother.

Because B.F. "meant the world to" M.A., it was important to her to support his boxing career; accordingly, every time he had a fight, she "made it a priority" to attend.  The August 2016 fight was the only one M.A. had ever been able to attend, however, so she made a special sign and sent it to B.F. to show how much she cared about him.  The sign said, "Flaunt it . . . Sting like a bee."

After the August 2016 boxing match, M.A. did not see B.F. for 11 months.  Although M.A. "kept trying to make plans with [B.F.]" — for example, by inviting him to a Rihanna concert — B.F. always declined.  At some point during those 11 months,

_____

[2]  By this point, M.A. had begun to "love" and "adore" B.F.  As a result, she "always tried to prioritize [B.F.] and [to] be with him and talk with him as much as possible."

4

B.F. moved to another city in the same county, which "kind of made it harder to meet up." In addition, although M.A. "always tried to prioritize" B.F., they did not hang out during those 11 months because she was "really busy with school and dance and work." M.A. nevertheless thought they were "still . . . romantic with each other" and had "chemistry" because they were still talking.

On one occasion during the 11-month hiatus, M.A. had sexual intercourse with someone else she considered "just a friend." Nevertheless, M.A. "still always . . . thought about [B.F.] and prioritized him . . . ." She did not believe she was cheating on B.F. by having sex with her other friend and she did not mention it to B.F. M.A. and B.F. never talked about being exclusive, and M.A. never asked B.F. if he was seeing or dating other women.

The next time M.A. saw B.F. after the August 2016 boxing match was on July 19, 2017, after he sent her a message saying he was in the area and wanted to "meet up." M.A. was living with her mother at the time, so they met up and went to her mother's apartment complex. They entered the complex's private movie theater and, after B.F. worked on his computer for a while, he suggested they have sex. M.A. agreed, and they had sexual intercourse in the theater. There is no evidence they continued to spend time together that day after they had sex.

Five days later, on July 24, 2017, B.F. again messaged M.A., saying he wanted to meet up. M.A. agreed to meet him, expecting to "spend quality time together and also have sex." She understood B.F. wanted to have sex because he included "a winky face" in his message and suggested they again go to her mother's apartment complex.

B.F. picked up M.A. in the mid-to-late afternoon and she sat in the passenger seat of his car while he drove. They kissed a couple of times at red lights. At one point, B.F. asked, "'Do you like it if I pull your hair?'" Before M.A. could respond she did not, B.F. "reach[ed] over and grab[bed her] right . . . on the back of [her] head

5

and neck and whip[ped her] around . . . and then snap[ped her] back . . . ." She "heard a noise . . . that was the sound of [her] bones cracking," and B.F. said, "I like it when I pull your hair."

M.A. was shocked and asked B.F. if he had heard the noise her neck made; B.F. did not respond. M.A. felt dizzy but was not in pain at that point, so she tried to make light of the situation, saying "I might have to wear a neck brace on the red carpet." B.F. responded, "You are so crazy, I don't think you would wear a neck brace on the carpet."

They arrived at the apartment complex a few minutes later. B.F. suggested they go into her mother's apartment, but M.A. did not feel they should have sex there. Instead, they kissed in the stairwell and then walked toward the pool. At B.F.'s suggestion, they entered the men's locker room, where they had sex in one of the shower stalls. Their sexual encounter was interrupted when someone entered the locker room. B.F. told M.A. to "shut up" and then instructed her to "go out first, and I will go out second." M.A. complied, and B.F. followed her outside. They returned to B.F.'s car and drove back to her university, where B.F. dropped M.A. off at a dance class. M.A. left the class early when she began to feel pain in her neck.

Later that night, as M.A.'s pain intensified, she sent B.F. a Snapchat message with a sad face emoji, telling him her neck "really hurts from getting whipped around today." B.F. responded, "Battle scars." When M.A. persisted, telling B.F. she was "sore because it cracked several times," B.F. responded with a video message saying he was tired, had had a long day, and was going to "pass out." M.A. again persisted, messaging — with another sad face emoji — "I know you had a long day, but no more hair pulling. Like my neck was badly affected by it." The record does not reflect any response from B.F. either that night or the following morning.

M.A. sought medical care the next morning because she was experiencing intense, sharp pain and could not move her neck. A doctor diagnosed her with a

6

concussion, "physical whiplash, similar to a car accident, . . . cervicalgia, [and] a muscle sprain."[3]

M.A. messaged B.F. that morning to tell him she was at the doctor's office, she was injured, her vertebrae were out of place, and she needed an X-ray. At that point, the tenor of B.F.'s responses changed. He texted he was sorry and did not mean to do this to her, and he offered to pay for her medical visit. Later, B.F. sent additional messages to M.A., saying he hoped she was feeling better, he was praying for her, and he was there for anything she needed. M.A. "didn't really respond." B.F. ultimately gave M.A. a check for $120 to help cover her medical copayment amounts.

On July 31, 2017 — one week after the incident — M.A. reported the incident to the university's campus security department, which issued a "no trespass" order against B.F. On or about the same day, M.A. filed a police report. She told the police officer who took the report she and B.F. had been "friends for approximately two years." M.A. also communicated with a criminal prosecutor about the incident in the hope he would file criminal charges against B.F. M.A. sent the prosecutor a letter describing B.F. as her "special friend," stating she "just wanted to be his friend," and acknowledging B.F. "never took me out on dates." Sometime in 2018, M.A. also spoke with an attorney from a nonprofit legal center about the incident with B.F.

M.A. ultimately sought counseling from a staff psychologist with the university's office of student psychological services, primarily to address the impact the injuries were having on her. In the course of her therapy sessions, M.A. referred to B.F. as her "special friend, friend with benefits."

M.A. acknowledged B.F. was never her boyfriend and she never referred to him as such. B.F. never asked her to be his girlfriend. She testified, "the thing is, we weren't dating, we were friends with benefits."

---

[3] As of the date of trial, M.A. was continuing to seek physical therapy for the injuries she sustained on July 24, 2017.

On cross-examination by B.F.'s trial counsel, M.A. acknowledged that over the course of nearly two years, she and B.F. had never gone on a social outing together and B.F. had never bought her a gift. They never had lunch or dinner together. B.F. neither attended M.A.'s birthday party nor took her out for a birthday dinner. M.A. never had a Thanksgiving or Christmas meal with B.F., and they never went out on Valentine's Day. B.F. never cooked dinner for M.A. at his home or joined her for dinner at her mother's home. They never went to a movie or a Los Angeles Lakers basketball game or a club together.

B. *The Psychologist's Testimony*

M.A. was the psychologist's patient for about four months beginning in mid-March 2018 and ending in July 2018. He met with her 14 times on a variety of topics, including the psychological impact of the injuries to her neck and other unrelated "life stressors" M.A. was experiencing.

During her sessions with the psychologist, M.A. described B.F. as "a friend." She "was very clear" that B.F. "was not a boyfriend," but was only a "friend with benefits." The psychologist thus understood B.F. was "a friend and there may have been some physical contact."

At some point while being treated by the psychologist, M.A. asked him to accompany her to a court hearing concerning potential criminal charges against B.F. He did so, not as a witness, but for emotional support, because M.A. was anxious about the hearing. The psychologist was still treating M.A. when she learned no criminal charges would be brought against B.F. The psychologist described the news as "a stressful blow" to M.A., because it made her feel "there was going to be no sort of justice or resolution to this."

Sometime after the court hearing, M.A. asked the psychologist to write a letter documenting the emotional harm M.A. was suffering as a result of her injuries. He

8

agreed to prepare a letter, believing M.A. had contacted an attorney and assuming the attorney had suggested it would be a good idea to make a record.

The initial draft of the psychologist's letter, dated July 6, 2018, stated M.A. and B.F. had been "friend[s] for two years." When he met with M.A. later that day and showed her the draft, M.A. asked him to revise it to state she "was dating" B.F. at the time of the July 24, 2017, incident. Although the psychologist understood from their therapy sessions that M.A. considered B.F. only a "friend with benefits," he made the requested change and signed the letter because M.A. told him it would be more accurate to say she was in a dating relationship with B.F. He wanted his letter to be accurate and complete.

## III.

### THE TRIAL COURT'S JUDGMENT

The case was tried to the court over two days in March 2022. Neither party requested a written statement of decision, and the court did not issue one. After hearing closing arguments, the trial court announced its decision from the bench the next afternoon. Noting M.A. bore the burden of proving there was a dating relationship, the court concluded, "[p]laintiff did not prove the elements necessary for the plaintiff to show that the relationship fits the category of a dating relationship and therefore [is] actionable as a domestic violence cause of action." The court entered judgment in B.F.'s favor in May 2022.

M.A. timely appealed. M.A. argues this court should conduct a de novo review of the evidence and determine, on the record before us, M.A. and B.F. were in a dating relationship when he physically assaulted her. M.A. argues the term "'dating relationship'" in Family Code section 6210 should be broadly interpreted and applied to encompass modern relationships and provide greater protection to victims of violence.

9

DISCUSSION

I.

THE APPLICABLE LAW

To establish the tort of domestic violence, M.A. must prove: "(1) The infliction of injury upon the plaintiff resulting from abuse, as defined in subdivision (a) of Section 13700 of the Penal Code," and "(2) The abuse was committed by the defendant, a person having a relationship with the plaintiff as defined in subdivision (b) of Section 13700 of the Penal Code." (Civ. Code, § 1708.6, subd. (a).)

Included among the relationships defined in Penal Code section 13700, subdivision (b) is a "dating" relationship. The statute provides: "'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or *person with whom the suspect* has had a child or *is having or has had a dating or engagement relationship*." (*Ibid.*, italics added.)

Penal Code section 13700 does not define a "dating" relationship, but the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA) does. Under the DVPA, a "'dating relationship'" consists of "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.) The parties agree this definition governs the analysis here.

Family Code section 6210's definition of "'dating relationship'" was added by the Legislature in direct response to the holding in *Oriola v. Thaler* (2000) 84 Cal.App.4th 397 (*Oriola*). In that case, the appellate court considered statutes addressing domestic violence from other states and held a "'dating relationship,'" as that term is used in California's DVPA (Fam. Code, § 6210) "refers to serious courtship. It is a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such

10

frequent interactions that the relationship cannot be deemed to have been casual."
(*Oriola*, at p. 412.)

Less than one year later, the Legislature added Family Code section 6210, defining "'dating relationship'" for the purposes of the DVPA. (Stats. 2001, ch. 110, § 1.) The legislative history of the new statute makes clear the Legislature disapproved of the *Oriola* court's definition because it imposed too narrow a test for what constitutes a dating relationship. The Legislature therefore adopted Family Code section 6210, defining "'dating relationship'" in the same language used in Penal Code section 243, subdivision (e)(1), misdemeanor battery in a dating relationship. In so doing, the Legislature emphasized the Penal Code section 243 definition has "withstood the test of the time." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 362 (2001-2002 Reg. Sess.) as introduced Feb. 16, 2001, p. 4.)[4]

## II.

### STANDARD OF REVIEW

We apply the substantial evidence standard of review to the trial court's factual determination whether a dating relationship existed. (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 849 (*Phillips*).) "'The ultimate determination is whether a *reasonable* trier of fact could have found [the existence of a dating relationship] based on the *whole* record. [Citation.]' [Citation.] 'We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. [Citation.]'" (*Id.* at pp. 849–850.) We independently

---

[4] Penal Code section 243, subdivision (f)(11) contains a nearly identical definition of dating relationship as Family Code section 6210: "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." (Pen. Code, § 243, subd. (f)(11).) (Family Code section 6210 uses the word "affection" in place of "affectional.") Contrary to our dissenting colleague's suggestion, the Legislature gave no indication when it adopted Family Code section 6210 that it intended to broaden the reach of the statute beyond what was already reflected in Penal Code section 243, subdivision (f)(11).

review issues of statutory interpretation. (*J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 641 [interpreting portion of DVPA].)

M.A. contends the de novo standard of review applies to the entirety of the appeal because the resolution of the dating relationship question requires the statute to be interpreted and statutory interpretation is a question of law. Given the clear holding of *Phillips* regarding the standard of review, we reject that contention.

That M.A.'s testimony was arguably undisputed because B.F. did not testify at trial does not change our analysis. (We note M.A. was thoroughly cross-examined by B.F.'s trial counsel.) The issue in this case is whether the trial court could have determined the parties were not in a dating relationship by applying the relevant statutory definitions to both the facts before it and the inferences reasonably drawn from them. In such a case, "we are bound by the lower court's determination of facts based upon substantial evidence and reasonable inferences drawn from those facts. [Citation.] If different inferences can be drawn from undisputed facts, we must accept the lower court's inference. [Citation.] However, if the court's inference is rebutted by clear, positive and uncontradicted evidence it may not be supported." (*Conservatorship of Geiger* (1992) 3 Cal.App.4th 127, 132; see *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 792 [where trial court's determination involves disputed facts or inferences drawn from undisputed facts, findings are reviewed for substantial evidence]; *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 926 [de novo review applies "where only one inference may reasonably be drawn from undisputed facts"].)

We conclude different inferences reasonably can be drawn from the uncontested facts of the parties' interactions here. We therefore are required to accept all reasonable inferences that support the trial court's judgment as part of our substantial evidence review.

## III.

SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING THAT M.A. AND B.F. WERE NOT IN A DATING RELATIONSHIP

To establish she was in a dating relationship with B.F., M.A. was required to prove they had "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.)  The statute does not attempt to define what it means to have "frequent, intimate associations." (*Ibid.*)  The ordinary meaning of the term "frequent" is common, usual, happening at short intervals, or often repeated or occurring.  (Webster's 3d New Internat. Dict. (1986) p. 909.)  "Intimate" means marked by (1) very close physical, mental, or social association, connection, or contact, (2) a warmly personal attitude, especially one developing through a long or close association or by friendliness, unreserved communication, mutual appreciation and interest, or (3) very close personal relationships, befitting a relationship of love, warm or ardent liking, deep friendship, or mutual cherishing.  (*Id.*, p. 1184.)

We conclude substantial evidence supports the trial court's finding that the interactions between M.A. and B.F. were not "frequent, intimate associations" (Fam. Code, § 6210) within the plain meaning of those terms.

Over the course of 19 months, M.A. and B.F. saw each other in person a total of eight times.  A reasonable trier of fact could certainly conclude this did not amount to frequent associations.

It is true the first three of the parties' in-person interactions — between early October 2015 and mid-November 2015 — occurred within a six to seven-week period and involved kissing or sexual activity, which might suggest, at least during that time span, M.A. and B.F. were in a dating relationship.  But M.A. did not try the case, or argue it on appeal, on the theory they were no longer dating when B.F. assaulted her in July 2017, but had previously been in a dating relationship in October and November of

13

2015. M.A.'s theory of the case — reflected in the allegations of her complaint and in her testimony, and reiterated by her counsel at oral argument on appeal — was that from October 2015, when she and B.F. ran into each other at a gym and kissed for the first time, to the day of the July 2017 assault, she and B.F. were in a continuous dating relationship that lasted for 19 months.

Even if we were to ignore M.A.'s own theory of the case and her testimony about the duration of the parties' relationship, a reasonable trier of fact could find that three physical encounters over a six to seven-week period did not amount to frequent and intimate associations for purposes of Family Code section 6210. We cannot conclude *as a matter of law* that three such interactions in such a time period amount to frequent and intimate associations within the meaning of the statute.

We also acknowledge the evidence the parties texted, messaged via Snapchat, or talked in between their in-person meetings.[5] M.A. testified that during the three periods when she and B.F. did not see each other for months at a time — the three-month hiatus from November 2015 to February 2016, the five-month hiatus from March 2016 to August 2016, and the 11-month hiatus from August 2016 to July 2017 — she and B.F. were "always" texting or talking.

The appellate record reflects the existence of social media communications; some were admitted into evidence. But M.A. did not include those exhibits in the appellate record, and we therefore have no basis to find they were sufficient to compel a conclusion that, together with the eight in-person meetings, the social media communications constituted frequent associations. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [appellant has burden of overcoming the presumption of correctness and, for this purpose, must provide an adequate appellate record demonstrating the alleged error]; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [failure to provide an adequate

---

[5] For ease of reference, we refer to the texts and Snapchat messages collectively as "social media communications."

record on an issue requires the issue be resolved against appellant].) Nor can we draw our own inferences about the nature of the social media communications and whether they reflect an intimate relationship. (*Conservatorship of Geiger, supra*, 3 Cal.App.4th at p. 132.) The trial court noted the social media communications in evidence were "initiated mostly" by M.A. and reflected no amorous responses from B.F.; indeed, some of his responses consisted of a single word. Having reviewed the timing and content of the social media communications admitted into evidence — including B.F.'s dismissive responses to M.A.'s initial expressions of concern that he had injured her — the court found they did not reflect frequent and intimate associations. The record before us does not, as a matter of law, require us to reverse that finding.

Moreover, even though B.F. presented no contradictory testimony, the trial court was not bound to accept the veracity of M.A.'s testimony that she and B.F. "always" talked and texted in between their sporadic in-person interactions. Credibility determinations are solely for the trier of fact. (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.) The court could have concluded the social media communications and telephone calls were far less frequent than M.A. suggested.

Because frequency and intimacy are essential elements of a "'dating relationship'" under Family Code section 6210, our conclusion that substantial evidence supports the trial court's finding that the parties' interactions were neither frequent nor intimate compels us to affirm the court's judgment in B.F.'s favor.

Other cases in which courts were called upon to determine whether a dating relationship existed confirm our view that the question is inherently fact-intensive and case-specific. For example, several years after the enactment of Family Code section 6210, another division of this court rejected the *Oriola* court's definition of a dating relationship as "unduly narrow" and "not [in] accord with the Legislature's definition to the extent [it] required 'serious courtship' and 'increasingly exclusive interest,' and a 'shared expectation of growth . . . .'" (*People v. Rucker* (2005) 126 Cal.App.4th 1107,

15

1117 (*Rucker*).) Although the *Rucker* court found that "[t]he Legislature was entitled to conclude the domestic violence statutes should apply to a range of dating relationships" (*id.* at p. 1116), it also held the statutory definition did not encompass "'a casual relationship or an ordinary fraternization . . . in a business or social context'" (*id.* at p. 1117). *Rucker* thus drew a distinction between "'casual relationship[s]'" (*ibid.*) and dating relationships that exhibit "unique emotional or privacy aspects" (*id.* at p. 1116).[6]

In *Rucker*, the trial court found the defendant, Rucker, and the victim she shot, Watson, had been in a dating relationship. The parties met through an Internet dating service and had their first date in July 2001. (*Rucker, supra*, 126 Cal.App.4th at p. 1110.) They went out to dinner, ate dinner at Watson's home, attended Rucker's office Christmas party together, and attended the wedding of one of Watson's friends. (*Ibid.*) "They became sexually intimate within their first two or three dates." (*Ibid.*) Watson traveled three or four weeks at a time for his job; when out of town he sometimes called Rucker or sent her e-mails saying he missed her and looked forward to seeing her. (*Ibid.*) Their last date was in April 2002, and Watson's last e-mail to Rucker was sent April 30. (*Ibid.*) In early May, Rucker placed a personal advertisement in a local newspaper and met two of the men who answered her ad. (*Ibid.*)

In late May, Rucker went to Watson's home, purportedly to pick up shoes she had left there. (*Rucker, supra*, 126 Cal.App.4th at p. 1111.) Rucker had three glasses of wine, the two engaged in sexual intercourse, and then Rucker shot Watson six times. (*Id.* at pp. 1111–1112.) At trial, the court admitted evidence of a previous incident of

_____

[6] Addressing the facts in *Oriola*, the *Rucker* court stated, "The relationship at issue in *Oriola* was clearly, by any reasonable person's definition, not a dating relationship. The parties had had only four social outings, only one of them alone; at the outset of the relationship the appellant had made it clear she did not want a romantic relationship with the respondent and had characterized herself as an acquaintance, not a girlfriend. In other words, the parties were, at most 'just friends,' and not in a dating relationship." (*Rucker, supra*, 126 Cal.App.4th at p. 1117.)

16

domestic violence by Rucker against a former boyfriend under Evidence Code section 1109.  (*Rucker*, at pp. 1112–1117.)  Rucker admitted she and Watson "'obviously'" had some sort of dating relationship, but argued it was too casual to come within the meaning of the domestic violence statutes.  (*Id.* at p. 1114.)  The appellate court, however, concluded, "There is substantial evidence in the record to support a finding [Rucker's] relationship with Watson was a 'dating relationship' within the meaning of the statutory definition and not merely a casual business or social relationship.  Rucker and Watson had frequent, intimate associations when Watson was in town over a period of approximately nine months and he communicated his affection to her when he was out of town.  The relationship was characterized by the expectation of affection and sexual involvement.  Watson testified it was a 'dating relationship.'  Rucker believed it was a serious relationship, possibly leading to marriage."  (*Id.* at p. 1117.)

*People v. Upsher* (2007) 155 Cal.App.4th 1311 (*Upsher*) followed *Rucker* and concluded the jury's finding the parties had been in a dating relationship was supported by substantial evidence, even though it was based largely on inferences. The facts relating to the parties' dating relationship included the following:  The victim (Teague) was in Upsher's house at 4:30 a.m. when the incident occurred.  (*Id.* at p. 1323.)  A witness heard Teague screaming for help and saw her being chased by Upsher.  (*Id.* at p. 1316.)  Upsher warned the witness not to call 911 and told him to mind his own business, saying, "'It's none of your fucking business what I do to my girl.'"  (*Ibid.*)  When the police arrested him, Upsher called out to Teague, "'You're going to do me like this, Tecia.'"  (*Ibid.*)  At trial, Upsher referred to Teague as "'my lady friend,'" "'my girl,'" and on one occasion as "'my wife.'"  (*Id.* at p. 1323.)

The appellate court concluded substantial evidence supported the trial court's finding of a dating relationship between the defendant and the victim.  "[T]o reverse a conviction for insufficiency of the evidence it must clearly appear *that on no hypothesis whatever* is there sufficient substantial evidence to support it. [Citation.]  We

17

are not persuaded Upsher has made such a showing.  In our view, the evidence recited above and the reasonable inferences that may be drawn from it were sufficient to permit a reasonable jury to conclude Teague and Upsher had enough of *an emotional and affectional involvement* to constitute a dating relationship within the meaning of [Penal Code] section 243, subdivision (e)(1)." (*Upsher, supra*, 155 Cal.App.4th at p. 1324, italics added.)

In *Hernandez v. State Personnel Bd.* (2021) 60 Cal.App.5th 873, 880 and footnote 3, the plaintiff's conviction under Penal Code section 273.5, which incorporates the Penal Code section 243 definition of "dating relationship," was found to be a predicate offense under the federal statute, which makes it illegal for anyone convicted of domestic violence to transport firearms via interstate commerce.  (18 U.S.C. 922(g)(9).)  "There may well be some overnight relationship too fleeting to qualify; we would have reason to conclude that a single-night tryst is insufficient.  But we do not have such a short-lived relationship here, as the undisputed evidence is that Hernandez spent most nights with his victim for at least five months." (*Hernandez*, at p. 880.)

Finally, in *Phillips*, the appellate court concluded a trial court sitting as the trier of fact has the authority to determine two parties were in a dating relationship, even though the parties did not characterize their relationship as such.  (*Phillips, supra*, 2 Cal.App.5th at pp. 846–847.)  Based on that finding, the court issued a restraining order against Campbell under the DVPA.  (*Id.* at p. 847.)

Phillips, the protected party, denied she was dating Campbell "as that term is commonly understood." (*Phillips, supra*, 2 Cal.App.5th at pp. 846–847.)  The parties had "'discussed [the] possibility of dating,'" but Phillips had e-mailed Campbell to say, "they were 'just remaining friends' and 'weren't dating, whether casually, socially, or non-committed dating.'" (*Id.* at p. 851.)

The parties were friends for several months, spent time together, dined out, and Campbell stayed in Phillips's home for several days.  (*Phillips, supra*, 2 Cal.App.5th

at p. 850.)  Phillips sent Campbell messages saying he had a strong emotional hold on her, complimenting one of his kisses, and saying his hug and his hand on her lower back felt good.  (*Ibid.*)  Phillips also messaged Campbell their relationship seemed more platonic than romantic when they wrestled on the couch or laid in bed together.  (*Ibid.*)  She also referred to "'[t]he time we've both invested to build our relationship over the past 7 months, . . . strengthening our love and respect for each other.'"  (*Ibid.*)

Campbell, for his part, believed their relationship was more than just a friendship.  (*Phillips, supra*, 2 Cal.App.5th at p. 850.)  "He accused her of 'leading [him] on' while she was dating someone else.  [Campbell] wrote:  'What do u call telling me u love me but ur . . . [with] someone else?'  'You can combine all those [other] guys . . . , and [they] still did not do for you what I did.'  'Didn't you tell me you wld always remember me and what a huge impact I had on your heart and life?'  'At least I wont hv to deal with u ever again.  How does tht make u feel that [the] only guy [i.e., appellant] u fell in love with ever would rather be dead than hear or see from u again?'  'Ppl [people are] probably confused after u lying so much about me but then seeing how much love you had for me.'"  (*Ibid.*)

At the hearing on the restraining order, Campbell testified he thought Phillips was falling in love with him.  (*Phillips, supra*, 2 Cal.App.5th at p. 850.)  He had told her he loved her just for herself without sex.  (*Id.* at pp. 850–851.)  There was no evidence the parties ever had sex, but Campbell sent nude photos of himself to Phillips in December 2012.  (*Id.* at p. 851.)

The appellate court affirmed.  "The trial court was not required to accept, and did not accept, [Phillips's] characterization of the parties' relationship.  [Phillips] never conceded that the parties did not have a 'dating relationship' within the meaning of [Family Code] section 6210.  Whether a dating relationship existed was a factual question to be decided by the trial court based upon all of the evidence.  The trial court stated:  '[A]lthough in one portion [of the e-mail Phillips] says . . . something about, "We don't

19

have a dating relationship," you do have a relationship by this evidence. All of the evidence shows there was an expectation of affection or desire to have affection . . . . So although you guys may have called it "We are not dating" or "We don't want to date," you certainly have all the attributes, it looks like, [of a dating relationship] under [section] 6210 of the Family Code.' When [Campbell] protested that he had never actually gone on a date with [Phillips], the court replied: 'What I have seen in these papers is that you guys had lots of communication, that you actually stayed at her residence . . . . So that's where I'm seeing there was something more to this than to say, "We never went on a date."'" (*Phillips, supra*, 2 Cal.App.5th at p. 851.)

"The trial court drew reasonable inferences from the evidence in concluding that there was a dating relationship. '[A] finding . . . based upon a reasonable inference . . . will not be set aside by an appellate court unless it appears that the inference was wholly irreconcilable with the evidence. [Citations.]' [Citation.] '[W]hen the evidence gives rise to conflicting reasonable inferences, one of which supports the finding of the trial court, the trial court's finding is conclusive on appeal. [Citation.]' [Citation.] Appellant has not demonstrated, as a matter of law, that the trial court erred in exercising its traditional power to draw reasonable inferences from the evidence." (*Phillips, supra*, 2 Cal.App.5th at p. 851.)

Just as the court in *Phillips* could determine the parties *were* in a dating relationship despite their testimony to the contrary, the trial court here could find, despite M.A.'s assertion to the contrary, the parties *were not* in a dating relationship based on the evidence and the inferences reasonably drawn from it.

We agree with *Rucker* that Family Code section 6210 can encompass a variety of relationships, traditional and otherwise. The facts here, however, permitted the court to reasonably draw an inference that M.A. and B.F. had a casual relationship marked by brief, sporadic sexual "hook ups," lacking the "emotional and privacy aspects" (*Rucker, supra*, 126 Cal.App.4th at p. 1116) or the "emotional and affectional

20

involvement" (*Upsher, supra*, 155 Cal.App.4th at p. 1324) that mark frequent, intimate associations.

Our holding does not mean another trier of fact could not find that parties in a "friends with benefits" relationship were in a dating relationship for purposes of the domestic violence statutes.[7] Given our society's evolving understanding of personal relationships, it is virtually impossible to craft a bright-line test to definitively identify a relationship that is — or is not — a dating relationship under Family Code section 6210. The obvious exceptions are on the margins: A true one-night stand or a long-term business relationship with no indicia of a personal, intimate nature, on the one hand, and a relationship of many months in which the parties regularly go out in public together, engage in intimate activities, but do not refer to themselves as boyfriend and girlfriend, on the other. Family Code section 6210 requires the relationship consist of "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (*Ibid.*) The trier of fact in each case must consider the evidence, the credibility of the evidence, and the reasonable inferences to be drawn from it. We cannot substitute our judgment for that of the trial court on matters of credibility. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 258 [reviewing court "cannot substitute its judgment as to the credibility of the witnesses or the weight of the evidence"]; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 ["We may not substitute our assessment of the credibility of a witness in place of the credibility

---

[7] We recognize the seriousness of domestic violence and appreciate the need to protect victims of domestic violence. We disagree, however, with the dissent's suggestion that it is "'incumbent upon . . . courts'" to do more to fashion or to ensure a remedy for victims of domestic violence. (Dissent, p. 7, quoting Note, *Refining the Meaning and Application of "Dating Relationship" Language in Domestic Violence Statutes* (2007) 60 Vand. L.Rev. 939, 943.) That task falls to the Legislature, and if it chooses to further define the term dating relationship it certainly may do so. Our task is to apply the law as adopted by the Legislature. We note M.A. had remedies available to her under the law to seek redress for her injuries, including tort claims against B.F. for assault and battery.

21

assessment of the trial court"].) Nor are we free to draw our own inferences from the facts. Only if the appellate record establishes the evidence cannot, on any hypothesis, support the trier of fact's finding that a dating relationship does (or does not) exist may the judgment based on that finding be reversed. In this case, and on this record, we find substantial evidence supports the trial court's finding M.A. and B.F. were not in a dating relationship.

### DISPOSITION

The judgment is affirmed. Respondent shall recover costs on appeal.


GOODING, J.

I CONCUR:


MOTOIKE, J.

22

SANCHEZ, J., Dissenting:

I respectfully dissent.

The majority's opinion, in effect, raises the bar for domestic violence victims by narrowly construing the definition of a "dating relationship." This approach disregards the Legislature's intent to broaden the definition of domestic violence in order to protect victims, who are made particularly vulnerable because of their intimate, albeit nontraditional, relationships with their perpetrators. In my opinion, Family Code section 6210 should be interpreted to encompass many types of modern relationships,[1] which are continuously evolving due to the influence of various factors, including social media,[2] and to provide greater protection to victims of domestic violence, not less. I would reverse the judgment.

I begin by addressing the standard of review. The majority cites the standard of review as substantial evidence and concludes substantial evidence supports the trial court's decision, to which it must defer. The facts of this case, however, are essentially undisputed. M.A. testified and put her psychologist on the stand. B.F. chose

---

[1] The majority characterizes the parties' relationship as "friends with benefits." Modern relationships, however, come in many different shapes and sizes. Tellingly, a finalist for the Oxford English Dictionary's, part of Oxford Languages, Word of the Year 2023 competition was "situationship," defined as "[a] romantic or sexual relationship that is not considered formal or established." (OxfordLanguages: Oxford Word of the Year (2023) <https://languages.oup.com/word-of-the-year/2023/> [as of Jan. 30, 2024], archived at: https://perma.cc/NB3F-6388.)

[2] With the widespread adoption of social media since the enactment of Family Code section 6210 in 2001 (Stats. 2001, ch.110, § 1), and the attendant practice of listing one's "relationship status" on such Web sites, many, especially young people have understandably become more reluctant to announce to the world they are in a "dating relationship" with another person. This practice has perhaps changed the *nonlegal* definition of a "dating relationship" in ways not anticipated by the Legislature. In any event, courts are not required to accept a party's characterization of whether that party is in a "dating relationship" for purposes of determining whether domestic violence occurred. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1117 (*Rucker*).)

1

not to testify and called none of his own witnesses. The parties discuss no material factual disputes decided by the trial court. Where the question is one of law derived from undisputed facts, the appellate court is not bound by the trial court's finding on an ultimate issue. (*Joiner v. City of Sebastopol* (1981) 125 Cal.App.3d 799, 803; *see Earnest v. Commission on Teacher Credentialing* (2023) 90 Cal.App.5th 62, 74; *Limited Stores, Inc. v. Franchise Tax Bd.* (2007) 152 Cal.App.4th 1491, 1496.) Thus, the proper standard of review in this case is de novo.

This brings me to the relevant statutes and the Legislature's intent. Penal Code section 13700, subdivision (b) states: "'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." Given this definition, it is evident the Legislature intended to protect victims against "domestic violence" occurring in various types of relationships. Thus, the Legislature included formal relationships (e.g., spouses and former spouses), less formal relationships (e.g., a person with whom the suspect has had a child or an engagement relationship), and even less formal relationships (e.g., a person with whom the suspect has had a dating relationship).

The only other case to interpret "dating relationship" in a narrow manner is *Oriola v. Thaler* (2000) 84 Cal.App.4th 397 (*Oriola*), where the court considered the meaning of the phrase "'dating relationship'" in the context of the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.; DVPA). In doing so, the court interpreted "'dating relationship'" to mean a "serious courtship," or a "social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." (*Oriola*, at p. 412.)

2

*Oriola* had a short shelf life. The following year, the Legislature disagreed with *Oriola*'s narrow definition of "dating relationship" and enacted Family Code section 6210 to address the issue. (Stats. 2001, ch. 110, § 1.) That statute broadly defines a "dating relationship" as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." (Fam. Code, § 6210.)

The legislative history of this change illuminates the Legislature's intent to broaden the definition of a dating relationship, contrary to *Oriola*'s restrictive definition. "The Senate Judiciary Committee analysis of [the] Assembly Bill [enacting Family Code section 6210] noted: '[T]he <u>Oriola</u> decision "resulted in the fact that anyone who was involved in a dating relationship short of 'serious courtship' is excluded from the protections of California's excellent Domestic Violence Prevention Act." [¶] If enacted, this bill would nullify the definition crafted by the court in <u>Oriola</u> . . . .'" (*Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 849.) In other words, by enacting Family Code section 6210, the Legislature nullified *Oriola*'s narrow definition of "dating relationship" and "conclude[d] the domestic violence statutes should apply to a range of dating relationships." (*Rucker, supra,* 126 Cal.App.4th at p. 1116.) Under the current definition, a "dating relationship" "does not require 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time." (*Ibid.*) Instead, the statute merely "requires 'frequent, intimate associations,' a definition that does not preclude a relatively new dating relationship." (*Ibid.*) This is because "dating relationships, even when new, have unique emotional and privacy aspects that do not exist in other social or business relationships and those aspects may lead to domestic violence early in a relationship." (*Ibid.*)

The majority opinion recites case law discussing the Legislature's intent in broadening the definition of "dating relationship" but then ignores these principles in its application of the law. Here, every indication in the record is that M.A. and B.F. engaged

3

in "intimate associations primarily characterized by the expectation of affection or sexual involvement . . . ." (Fam. Code, § 6210.) Indeed, this is the only reasonable inference to be drawn from the evidence. From October 2015 to March 2016, B.F. invited M.A. to his home on two different occasions where they watched television together and he performed oral sex on her, they kissed on several occasions, they spent time kissing in a hot tub on another occasion, and they arranged to meet each other at a gym where they worked out together and kissed. M.A. later attended one of B.F.'s boxing matches where she met his mother and made a sign to support him. They also had sex on two subsequent occasions. In between these intimate encounters, they maintained contact via text messages, and M.A. testified she had started to "love and adore" B.F. After the subject incident in B.F.'s car, B.F. sent text messages to M.A. stating he was worried about her, she was "special" to him and meant "so much" to him, he wanted to be there for her, and he was praying for her. He also paid part of her medical bills. These interactions were undeniably intimate and were primarily characterized by affection and sexual involvement. B.F. certainly expected and received affection and sexual involvement from M.A. The majority concedes M.A. and B.F. engaged in several "sexual 'hook ups.'"

This brings me to the central issue in this case: whether the parties' intimate associations were *frequent*. The majority acknowledges the parties' early interactions "might suggest" they were in a dating relationship because their intimate associations were frequent. But the majority's analysis rejects that conclusion because, "M.A. did not try the case, or argue it on appeal, on the theory they . . . had previously been in a dating relationship . . . ." M.A., however, never forfeited the issue. Her counsel simply made the broadest possible argument under the statute—the parties were in a dating relationship the entire time. But the law does not require the dating relationship be in existence at the time of the abuse. Instead, the law protects a person with whom the suspect is having *or has had* a dating relationship. (Pen. Code, § 13700,

4

subd. (b).)  The majority's focus on the times during the relationship the parties had not physically seen each other (as opposed to keeping in contact via text) and the things the parties did *not* do, e.g., B.F. *not* attending M.A.'s birthday party, *neither* kissing each other at B.F.'s boxing match *nor* hanging out afterward, and *not* attending a concert together does not negate that the parties, at minimum, had had a dating relationship in the past.  That is sufficient under the statute.

During the first several months of their relationship from October 2015 to March 2016, M.A. and B.F. undeniably had *frequent*, intimate associations characterized by kissing, sex, and the expectation of further sexual involvement.  They had oral sex twice in B.F.'s home, spent time together at the gym on two occasions, and spent time kissing in a hot tub on another occasion.  They also maintained contact through text messages during this time.  The requirement of a "dating relationship" was therefore satisfied under the statutory definition in those early months.[3]

My conclusion, unlike that of my colleagues in the majority, is supported by the significant public policy against domestic violence and the purpose of the DVPA—protecting individuals from violence in intimate relationships.  (Fam. Code, § 6200 et seq.)  Indeed, the Legislature enacted Family Code 6210 to correct the overly narrow definition of "dating relationship" set forth in *Oriola, supra*, 84 Cal.App.4th 397, expressly stating its intention to expand both the types of relationships covered by the statute and consequently the number of protected victims.  In light of this purpose, the Legislature did not intend the "frequency" requirement to be difficult for victims to meet.  Instead, the frequency of the intimate associations need only be enough to establish the victim's trust and vulnerability, which plainly existed here.

---

[3] I disagree with my colleagues in the majority that this is a factual dispute. Rather, whether the parties were in a "dating relationship" is a legal conclusion based on undisputed facts, which may be reviewed de novo by this court.

My conclusion, unlike the majority's, also is buttressed by published case law addressing this issue. Nearly all the California cases addressing the definition of "dating relationship," including all the cases cited in the majority opinion, found a dating relationship existed. (*Rucker*, *supra*, 126 Cal.App.4th 1107; *Phillips v. Campbell*, *supra*, 2 Cal.App.5th 844; *People v. Upsher* (2007) 155 Cal.App.4th 1311; *Hernandez v. State Personnel Bd.* (2021) 60 Cal.App.5th 873.) The majority does not cite to a single published case finding no dating relationship existed and effectively denying protection to a victim of domestic violence on that basis.

Courts in other states have similarly interpreted "dating relationship" in broad terms to afford the greatest protection to victims of violence. In *C.C. v. J.A.H.* (N.J.Super.Ct.App.Div. 2020) 463 N.J.Super. 419, 424 [232 A.3d 505], a New Jersey court held a relationship where the parties exchanged more than 1,000 intimate text messages but never went out together constituted a "dating relationship" under New Jersey's Prevention of Domestic Violence Act. (*C.C.* at p. 509.) In *T.M. v. R.M.W.* (N.J.Super.Ct.Ch.Div. 2017) 456 N.J.Super. 446 [195 A.3d 152], a New Jersey court held a relationship involving sporadic, sexual encounters over the course of eight years constituted a "dating relationship" under New Jersey's Prevention of Domestic Violence Act. The parties' relationship had "few, if any, of the traditional elements of a dating relationship . . . ." (*T.M.*, at p. 154.) The parties also did not present themselves as boyfriend and girlfriend (*id*. at p. 155), and the defendant in fact had another girlfriend (*id*. at p. 156). The court emphasized that denying the plaintiff the status of a victim could be seen as "morally judging a plaintiff who chooses not to engage in a relationship with 'traditional' and 'observable' indicia of dating." (*Id.* at p. 158.) In *State v. Doane* (Wash.Ct.App. 1997) 86 Wash.App. 1008, a Washington court held the parties were in a "dating relationship" where they only had a few sexual relations over a couple of weeks.

Considering all of the above, M.A. falls into the category of victims the law was meant to protect. As commentators have noted, "domestic violence is as prevalent

6

among teenagers and young adults as it is among married adults," but youth are often overlooked in domestic violence statutes. (Isabelle Scott, Domestic Violence Practice and Procedure (2023) § 11:17.) Various factors may make it difficult for young adults to end relationships, including "lack of experience with intimate relationships." (*Ibid.*) "Colleges and universities, therefore, can be likely settings for incidents of domestic violence." (*Ibid.*) "It is incumbent upon . . . courts to do more for teenaged victims of dating violence by extending protection to all victims of abuse. (Note, *Refining the Meaning and Application of "Dating Relationship" Language in Domestic Violence Statutes* (2007) 60 Vand. L.Rev. 939, 943.) I understand the Legislature to have been responding, in part, to this concern by broadly defining "dating relationship" as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement." In my view, the DVPA should be construed by the courts to effectuate the Legislature's purpose of protecting all eligible victims, including those in nontraditional relationships, not to do so in a manner to make it more difficult for victims to find protection. Accordingly, I would reverse with instructions to the trial court to enter a finding that a dating relationship existed and to hold further hearings to determine, in the first instance, whether domestic violence occurred.

SANCHEZ, ACTING P. J.

7